UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AARON PIERCY, as Administrator of the Estate of Dale Piercy | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 14 CV 7398 |
| WHITESIDE COUNTY, ILLINOIS, et al, | ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Dale Piercy died from gastrointestinal hemorrhaging on October 19, 2013, while he was incarcerated at Illinois' Stateville Correctional Center. Symptoms of Piercy's fatal illness had emerged several weeks earlier, when Piercy was confined at Whiteside County Jail (WCJ). Plaintiff Aaron Piercy[1], the son of the deceased and the administrator of his estate, filed this suit on September 23, 2014 against WCJ, the Illinois Department of Corrections (IDOC), and numerous employees of each institution. Also named as defendants are two organizations that provide health care services at WCJ and Stateville: Advanced Correctional Healthcare, Inc. (ACH) and Wexford Health Sources. Piercy has since amended his complaint several times. The most recent version, the fourth amended complaint, includes eight counts involving claims arising under state law as well as 42 U.S.C. § 1983.

Numerous motions are pending before the court. Defendant Dan Williams, a physician's assistant working for ACH, has filed a motion to dismiss, pursuant to Rule 12(b)(6) [156]. So, too, have several Wexford Defendants [215]. Meanwhile, Plaintiff and the WCJ Defendants have reached a settlement agreement, and Piercy has moved for a finding of good faith concerning that settlement [167]. The ACH Defendants and the Wexford Defendants have

---

[1] For the sake of simplicity, the court refers to both the Plaintiff and Dale Piercy as "Piercy," where disambiguation is unnecessary.

objected to that motion, which, if granted, would bar the non-settling Defendants from seeking a setoff. In that same vein, the ACH Defendants have filed motions for leave to file (1) a third-party complaint and cross-claim for contribution against the WJC Defendants [184], and (2) amended affirmative defenses related to their potential right to a setoff [263].

For the reasons stated below, the Wexford Defendants' motion to dismiss [215] is granted in part and denied in part. Williams' motion to dismiss [156] is denied. The Plaintiff's motion for a finding of good faith [167] is denied. ACH's motion for leave to file a contribution claim against WJC [184] is denied in part and granted in part, and its motion for leave to file amended affirmative defenses [263] is granted.

## **BACKGROUND**

### I. Factual History

Dale Piercy was taken into custody at the WCJ on September 25, 2013. (Fourth Am. Compl. [250] ¶ 30.) From the time he arrived at WCJ, Piercy suffered from stomach pain. He first saw a medical provider—nurse Julie Warkins, an ACH employee—on September 27, 2013. (Settlement Agreement, Ex. 1 to Mot. for Good Faith Finding, R. 167, at 2.) She consulted with physician's assistant Dan Williams who prescribed Zantac 75, an over-the-counter heartburn remedy. (Fourth Am. Compl. ¶ 31.) Piercy continued to report discomfort to medical and corrections personnel at WCJ, but was given no further treatment. (*Id.* ¶ 33.) Piercy's brother visited on September 29, 2013, and Plaintiff told him that he had been vomiting blood for three days. (*Id.* ¶ 32.) Plaintiff was transferred to Stateville on October 4, 2013, where he "encountered"[2] two defendants, Lee Redman, a Wexford nurse, and Craig Howard, an IDOC psychiatrist. (*Id.* ¶ 35.) Although Piercy reported that he was taking medication for a stomach issue, neither Redman nor Howard secured medical attention for Piercy and neither ensured that Piercy continued to receive Zantac 75. (*Id.*)

---

[2] The fourth amended complaint does not elaborate on the nature of Piercy's "encounter" with Redman and Howard.

Over the next two weeks at Stateville, Piercy's condition worsened. He continued to vomit blood and later lost control of his bowels. (*Id.* ¶ 36.) He reported his symptoms to prison personnel (both correctional and medical) on multiple occasions, but his requests for medical treatment were ignored. (*Id.*) In fact, between October 4, 2013 and October 19, 2013, Piercy and other prisoners housed in the same unit submitted multiple requests, both orally and in writing, seeking medical attention for Piercy. Those requests produced no results. (*Id.* ¶ 37.)

At approximately noon on October 19, 2013, officials brought Piercy to the healthcare unit at Stateville via wheelchair. (*Id.* ¶ 39.) At this point, Piercy suffered from severe dehydration and high blood sugar. (*Id.*) His color was pallid, his skin cold to the touch, and his pulse was so weak that medical personnel struggled to manually detect his heart rate. (*Id.*) Despite these symptoms, Defendants Vipin Shaw and Paul Talbot—both of whom were physicians working for Wexford at Stateville—failed to immediately call an ambulance. (*Id.*)

Shortly after arriving at the healthcare unit, Piercy lost consciousness and his vital signs dropped, and an ambulance was eventually requested.[3] (*Id.*) By the time an ambulance arrived, Piercy was unresponsive. (*Id.* ¶ 40.) He was transported to nearby St. Joseph's Hospital, but was pronounced dead on arrival. (*Id.*) A subsequent autopsy revealed Piercy's cause of death as gastrointestinal hemorrhaging. (*Id.*)

## II. Procedural History

Aaron Piercy filed this suit on September 23, 2014. The original complaint contains eight counts: (1) a § 1983 claim for deliberate indifference in the denial of medical care; (2) a § 1983 conspiracy claim; (3) a § 1983 failure-to-intervene claim; (4) a state-law claim for intentional infliction of emotional distress; (5) a wrongful-death claim; (6) a survival claim; (7) a respondeat superior claim; and (8) an indemnification claim.

---

[3] The complaint does not explain who called for an ambulance, when the ambulance was requested, or what triggered the decision to make that call.

Several defendants filed motions to dismiss: Stateville Defendants Tarry Williams (warden), Royce Brown-Reed (administrator of the health care unit), and Sarah Mays (a correctional medical technician)—moved to dismiss Counts II-VIII and to "to bifurcate the policy claims set forth [in Count I] from the remainder of this case" [47]; Defendant ACH and its employee, nurse Julie Warkins, moved to dismiss Counts V-VIII [52]; and Defendant Wexford and its employees, Saleh Obaisi (physician) and Lee Redman (nurse), moved to dismiss Counts II, III, V, VI [54]. Ruling from the bench, the court granted in part and denied in part each of the motions. A brief written order, dated January 23, 2015, summarized the rulings:

> Plaintiff's conspiracy allegations (Count II) put Defendants on notice of the date, nature, and participants in the alleged conspiracy; these allegations are sufficient to state a claim of conspiracy. Plaintiff contends that his negligence claims in Counts IV and V differ from a claim of medical malpractice; but as the court reads the allegations in this case, they suggest both pure negligence (a failure to provide any treatment) and malpractice (a course of treatment inconsistent with the standard of care for the condition at issue). Accordingly, the court expects Plaintiff to furnish the appropriate § 2-622 affidavit within 30 days. The respondeat superior theory is available for these state law claims, and Count VII survives as against the Whiteside Defendants, Wexford, and ACH. Plaintiff's allegations against state Defendants (Counts IV- VI) challenge those Defendants' conduct within the scope of their authority, and within their ordinary duties, owed to Plaintiff as a function of state employment (not owed to the public generally). Individual state Defendants therefore appear to enjoy sovereign immunity from claims in Counts IV-VI. By agreement, Count VIII is dismissed as against the ACH Defendants and the individual IDOC Defendants. The court declines to rule at this time on the "failure to intervene" claims (Count III) owed to Plaintiff. Motion to bifurcate [47] is denied.

[69]

Piercy has since amended his complaint several times. The most recent version of these is the fourth amended complaint [250], which identified by name certain defendants who were unnamed in previous iterations. The third amended complaint [120] added several defendants, including Dan Williams, who has filed a motion to dismiss Counts I-VI [156]. Williams was an employee of ACH and a physician's assistant at WCJ at the time Piercy was incarcerated there. Wexford and several of its employees who were named for the first time in

4

the third amended complaint (collectively, the Wexford Defendants)[4] have also moved to dismiss that complaint in its entirety [215].[5]

Meanwhile, Piercy and the Whiteside County Defendants have agreed to settle all claims against the latter for $50,000. (Release and Settlement Agreement, Ex. 1 to R. 167, at 1.) That settlement is limited to the following:

> Plaintiff's claim for damages for any physical injuries or physical pain and suffering Dale Piercy may have suffered as a result of the conduct of the Sheriff or any of his current or former employees or agents, from the time Dale Piercy was admitted into Whiteside County Jail on September 25, 2013 until the time he met Nurse Julie Warkins (employed by Advanced Correctional Healthcare) on September 27, 2013 at the Jail.

(*Id.* at 2.) In exchange, Plaintiff released any other claims he might have against the Whiteside County Defendants—including any claims stemming from Piercy's suffering at WCJ from September 27 until his October 4, 2013 transfer to Stateville—and agreed to dismiss without prejudice all claims pending against them. (*Id.* at 2, 4.) The parties then filed a joint motion for a finding of good faith settlement. [167] The ACH Defendants [184] and the Wexford Defendants [187] have each filed responses objecting to that motion. The ACH Defendants have also moved for leave to file (1) a third-party complaint seeking contribution from the settling Whiteside County Defendants [184], and (2) amended affirmative defenses [263].

---

[4] All of the newly-named Wexford Defendants worked for Wexford at Stateville. They are Cynthia Garcia, Dr. Khadeer Ahmed, Dr. Arthur Funk, Dr. Evaristo Aguinaldo, Dr. Paul Talbot, Melinda Parra, Candice Kaminski, Athena Rossiter, Tiffany Utke, Amy Bartlett, Gerald Dimailig, Marian Andrews, and Lidia Lewandowska.

[5] Both Williams' and Wexfords' motions to dismiss are targeted at Plaintiff's third amended complaint. After granting Plaintiff's motion for leave to file a fourth amended complaint, the court issued the following order: "All Defendants have leave to file, amend, or confirm that they stand on pending motions to dismiss by 2/18/2016." (R. 249.) As no Defendant filed anything to that effect, the court will rule on the arguments made in their motions to dismiss the third amended complaint as they apply to the fourth amended complaint.

5

**DISCUSSION**

I.  **Plaintiff's Motion for a Finding of Good Faith and ACH's Motions for Leave to File**

The court turns first to the settling parties' motion for a finding of good faith settlement, and ACH's related motion for leave to file a third-party complaint and cross-claim against the WCJ Defendants for contribution.

   A.  **Good Faith Settlement**

Illinois's Joint Tortfeasor Contribution Act ("Contribution Act") creates a statutory right of contribution in actions "where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death," to the extent that a tortfeasor pays more than his pro rata share of the common liability. 740 ILCS 100/1, 2(a), 2(b). But no contribution may be obtained by or from a tortfeasor with whom the injured party has settled in good faith. *Id.* § 2(d). This distinction is at the heart of the parties' dispute over the settlement between Piercy and the Whiteside County Defendants. The non-settling Defendants believe that any possible liability they may face for Piercy's death is shared with Whiteside County. In the event that Plaintiff receives an award stemming from Piercy's death, the non-settling Defendants want to make sure that the County pays its rightful portion of the shared liability.

"[T]he settling parties carry the initial burden of making a preliminary showing of good faith," which requires "the existence of a legally valid settlement agreement." *Johnson v. United Airlines*, 203 Ill. 2d 121, 129, 784 N.E.2d 812, 820 (Ill. 2003). Defendants here do not challenge the validity of the settlement agreement, so the burden shifts to them to prove the absence of good faith by a preponderance of the evidence. *Id.*

Courts primarily consider four factors, none of which is determinative, when analyzing whether a settlement was made in good faith: (1) "whether the amount paid by the settling tortfeasor was within a reasonable range of the settlor's fair share;" (2) "whether there was a close personal relationship between the settling parties;" (3) "whether the plaintiff sued the settlor;" and (4) "whether a calculated effort was made to conceal information about the

circumstances surrounding the settlement agreement." *Wreglesworth v. Arctco, Inc.*, 317 Ill. App. 3d 628, 634, 740 N.E.2d 444, 449 (1st Dist. 2000) (internal quotations and citations omitted). Defendants have not argued that any of these factors, as applied in this case, suggest that the settlement was made in bad faith. Rather, they point the court to another factor it must also consider: "whether the agreement is consistent with the policies underlying the Contribution Act." *In Re Guardianship of Babb*, 162 Ill. 2d 153, 170, 642 N.E.2d 1195, 1203 (Ill. 1994). Those policies are the "the encouragement of settlements and the equitable apportionment of damages among tortfeasors." *Johnson*, 203 Ill. 2d at 133, 784 N.E.2d at 821. An agreement that conflicts with these policies does not satisfy the good-faith requirement. *Id.*

Defendants argue that the settlement was not made in good faith because it "blatantly allocates the settlement proceeds in an effort to deprive the . . . [nonsettling] Defendants of their right to a setoff." (ACH Defs.' Supp. Resp. to Mot. for Good Faith Finding at 6.) As they read the complaint, the Plaintiff's "theory of the case is that all of the named Defendants collectively provided medical care to the Decedent that led to one indivisible injury—his death." (Wexford Defs.' Resp. to Pl.'s Mot. for a Finding of Good Faith Settlement, R. 187, at 3.) But, they argue, his settlement with the Whiteside County Defendants—which is limited to the suffering Piercy suffered in the first two days at WCJ (i.e., before the other Defendants had contact with Plaintiff)—artificially separates their liability from that of the other Defendants. The court agrees.

Several factors suggest that the settlement agreement would lead to the nonsettling Defendants paying more than their pro rata share of damages. First, Plaintiff's claims against the Whiteside County Defendants have never been limited to his first two days in custody there. To the contrary, the complaint largely treats as identical the Whiteside County and the nonsettling Defendants: Piercy alleged that the Whiteside County Defendants were aware of the existence of a "widespread practice" of denying medical care to ill inmates at the WCJ; and the complaint also includes an allegation of a conspiracy between both the settling and nonsettling Defendants to deprive Piercy of medical care. (Fourth Am. Compl. ¶ 40-50, 84-89.)

7

The notion that Piercy's suffering from his first two days at the WCJ is divisible from his other injuries is further belied by the fact that Piercy remained at the jail for several days beyond that period and that Piercy specifically alleged that WCJ officials provided no care for him after September 27, 2013.

Attempting to defend the deal, Plaintiff argues that "[o]nce Dale Piercy came into contact with [ACH employee nurse Julie] Warkins [on September 27, 2013], the liability of correctional staff at the Jail became much murkier." (Pl.'s Consolidated Resp. & Reply at 10.) But "murkier" does not equal "nonexistent." And this argument does little to protect the good-faith status of the settlement agreement, given that, under the Contribution Act, "contribution is not limited only to joint tortfeasors. Instead, as the Act specifically provides, the Act applies to 'one or more persons liable in tort,' regardless of whether the liability is joint. Thus, the Act applies to not only joint tortfeasors, but to concurrent and successive tortfeasors as well." *Patton v. Carbondale Clinic, S.C.*, 161 Ill. 2d 357, 368, 641 N.E.2d 427, 432 (1994).

The ACH and Wexford Defendants have raised a valid concern that the settlement agreement between Plaintiff and the Whiteside County Defendants was allocated in bad faith to preclude a setoff. *Cf. Pasquale v. Speed Prods. Eng'g*, 166 Ill. 2d 337, 370, 654 N.E.2d 1365, 1382 (1995) ("[A] setoff is inappropriate where sought to be applied against a recovery for injuries separate and distinct from those for which the plaintiff was already compensated through settlement.") Plaintiff contends that "taking into account the evidence gathered to date through discovery, the Settling Parties determined . . . that it was highly unlikely the Whiteside County Defendant would be liable for any injuries or damages, much less those incurred after the nurse's examination." (Whiteside County's Reply in Support of Mot. for Finding of Good Faith [198] at 4.) But the court has no knowledge of what discovery shows at this stage. It therefore has no reason to believe that Whiteside County's alleged neglect of Plaintiff's complaints while he was at WCJ *after* September 27, 2013 had no deleterious effect on his

8

condition. Plaintiff's own allegations suggest that the opposite is true. Plaintiff's motion for a finding of good faith settlement is denied.

### B. ACH Defendants' Motions for Leave to File

The ACH Defendants' motion for leave to file a third-party complaint and cross-claim for contribution against their co-Defendants is also denied as it relates to Plaintiff's § 1983 claims. The Supreme Court has held that it will not add a common law right of contribution to a federal statute without the guidance of Congress. *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 98 (1981). Neither the Supreme Court nor the Seventh Circuit has reached the specific question of whether there is a right to contribution under § 1983. "[A] majority of District Courts that have addressed the issue," however, have concluded that the answer is "no." *Estate of Carlock ex rel. Andreatta-Carlock v. Williamson*, No. 08-3075, 2009 WL 1708088, at *4 (C.D. Ill. June 12, 2009); *see also Creek v. Westhaven*, No. 83 C 1851, 1989 U.S. Dist. LEXIS 2657, at *5 (N.D. Ill. March 14, 1989) ("This court finds that § 1983 does not provide the defendants with a right of contribution.").

But that does not mean that the ACH Defendants are foreclosed from seeking contribution from their co-Defendants with regard to Piercy's state-law claims. Furthermore, the ACH Defendants are free to seek a setoff on the § 1983 claims post-judgment. *See Zivitz v. Greenberg*, 279 F.3d 536, 539 (7th Cir. 2002) ("A motion under Rule 59(e) to alter or amend the judgment is an appropriate vehicle to request a setoff of a jury verdict.") "A right of contribution is the right of a joint and several tortfeasor to bring a distinct cause of action against a fellow defendant to apportion the cost of damages, while a setoff is a procedural device for adjusting a verdict to avoid a windfall to the plaintiff." *Fox v. Barnes*, No. 09 C 5453, 2013 WL 2111816 at *3 (N.D. Ill. May 15, 2013) (citing Martin A. Schwartz*, Section 1983 Litigation Claims and Defenses* § 16.15 (rev. 2013)).

The ACH Defendants' motion is thus denied in part and granted in part. It is denied with regard to Plaintiff's § 1983 claims, but that denial is without prejudice to a potential post-

judgment motion seeking a setoff on those claims. There is no such bar, however, related to Plaintiff's state-law claims.

Finally, Plaintiff objects to ACH's proposed affirmative defense of several liability.[6] ACH contends that "Each of the ACH Defendants individually is less than 25% at fault for the injuries and damages sought by Plaintiff and should be only severally liable for any damages which may be awarded in this matter." (Amended Aff. Defenses [263] at 4.) Piercy argues that ACH should be denied leave to plead this defense because it is "futile," given that it applies only to "negligence claims that do *not* sound in medical malpractice." (Pl.'s Consolidated Resp. & Reply at 12-13.) He goes on to point out that the ACH Defendants have previously argued that Piercy's claims "are in fact medical malpractice claims." (*Id.* at 13.) But these arguments do little to help Piercy's cause in light of the court's ruling that not all of Piercy's claims sound in malpractice. (*See* R. 69 (finding that Piercy's claims "suggest both pure negligence . . . and malpractice"). ACH's motion for leave to file amended affirmative defenses is granted.

## II.     Dan Williams' and Wexford Defendants' Motions to Dismiss

The court will address Williams' and the Wexford Defendants' Motions to Dismiss in tandem. At all times relevant to this case, Williams was an employee of ACH and worked as a physician's assistant at WCJ. He has moved to dismiss all of Piercy's claims against him (i.e., Counts I-VI), arguing that Plaintiff has failed to "plead[] enough facts to 'show' that [he] is entitled to relief."[7] (Williams' Mem., R. 168, at 5.) The Wexford Defendants have moved to dismiss each of the eight counts of the complaint.

---

[6] Plaintiff previously objected to another affirmative defense—comparative fault— raised by the ACH Defendants in an earlier filing [185]. The Defendants have dropped that defense in their most recent amended affirmative defenses [263].

[7] Williams also argued that dismissal of Plaintiff's state-law claims is necessary due to Plaintiff's failure to file a 735 ILCS 5/2-622 affidavit with regard to Williams. Section 2-622 requires that any plaintiff seeking damages for medical malpractice attach to the complaint a report from a qualified health professional stating that she has reviewed the medical records and believes that the plaintiff has a reasonable and meritorious cause to file the action. The purpose of § 2-622 is to "reduce the number of frivolous suits that are filed and to eliminate such actions at an early stage, before the expenses of litigation have mounted." *DeLuna v. St.*

### A. Standard of Review

Motions to dismiss test the sufficiency, not the merits, of a plaintiff's case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a motion to dismiss under federal notice pleading, a plaintiff must "provide the grounds of his entitlement to relief" by alleging "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks, brackets, and citation omitted). Specific facts are not necessary. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). The court treats well-pleaded allegations as true, and draws all reasonable inferences in the plaintiff's favor. *Disability Rights Wisc., Inc. v. Walworth County Bd. Supervisors*, 522 F.3d 796, 799 (7th Cir. 2008).

### B. Counts II and VIII

The Defendants' motions may be addressed quickly as they relate to Counts II and VIII. With regard to Count II, the Defendants' motions are essentially identical to earlier motions to dismiss filed by ACH and Julie Warkins [52] and Wexford, Obeisi, and Redman [54]. The court denied those motions (R. 69), and reaches the same conclusion as to Williams' claim. Similarly, Wexford's motion is consonant with ACH's motion to dismiss Count VIII, a state-law indemnification claim. Piercy has acknowledged that ACH is not subject to indemnification claims under Illinois law as a nongovernmental entity. (R. 63 at 20.) The same reasoning applies with equal force to the Wexford Defendants.[8] Their motion is granted as to Count VIII.

### C. Count I: Deliberate Indifference

That leaves Count I, and Counts III through VII. Count I is a deliberate indifference claim, which requires Plaintiff to allege that: (1) he had an objectively serious medical condition;

---

*Elizabeth's Hosp.*, 147 Ill. 2d 57, 65, 588 N.E.2d 1139, 1142 (1992). Piercy has now satisfied this requirement by including such an affidavit in his response to Williams' motion. Although the statute requires such an affidavit be attached to the complaint, the court is unwilling to dismiss a potentially meritorious claim under such a technicality where no significant prejudice has resulted from Plaintiff's delay.

[8] Plaintiff has failed to respond to Wexford's motion to dismiss his third amended complaint. To the extent that Wexford's motion is substantively identical to either Williams' motion or one of the earlier motions in this case, the court has assumed that Piercy's previous response would also be adopted.

(2) the defendant knew of the condition and was deliberately indifferent to treating him; and (3) this indifference caused him some injury. *See Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010). Williams and the Wexford Defendants argue that Plaintiff has failed to plead that any of them individually "was aware of, much less deliberately indifferent to, any medical need of Dale Piercy." (Williams' Mem. at 6-7.) Piercy points out, however, that he has alleged that Piercy reported he was vomiting blood to medical personnel at WCJ and Stateville, yet he was not given any treatment. He further alleges that all Defendants "had notice of Dale Piercy's medical needs and the seriousness of his medical needs, and knew the risk of harm to Dale Piercy if he did not receive appropriate medical care. Despite that knowledge, Defendants failed to provide him with any proper medical care." (Pl.'s Resp. to Williams' Mot. to Dismiss, R. 173, at 3.) Piercy also reports that discovery has revealed that a nurse consulted Williams about Piercy on September 27, 2013, and it was Williams who prescribed Zantac 75 for Piercy.[9] (*Id.*) Together, these allegations are sufficient to state a claim for deliberate indifference against Williams and the Wexford Defendants.

### D. Count III: Failure to Intervene

Both Williams and the Wexford Defendants moved to dismiss Count III, a failure-to-intervene claim. To state a failure-to-intervene claim under § 1983, Piercy must allege that "[a] constitutional violation has been committed by a [state actor]; *and* the [defendant] had a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 744 (7th Cir. 2005). Piercy's allegations on this score are closely connected with his deliberate indifference claims. Plaintiff argues that Williams and the Wexford Defendants were not only deliberately indifferent to Piercy's need for medical attention, but that they were aware

---

[9] That Williams wrote a prescription for Plaintiff does not foreclose the possibility that Williams acted with deliberate indifference. A prison doctor may exhibit deliberate indifference to a known condition (i) "through inaction," (ii) "by persisting with inappropriate treatment," or (iii) "by delaying necessary treatment and thus aggravating the injury or needlessly prolonging an inmate's pain." *Gaston v. Ghosh*, 498 Fed. Appx. 629, 631-32 (7th Cir. 2012); *see also Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998) (holding that "inaction or woefully inadequate action" can constitute deliberate indifference).

of the failure of other Defendants to provide medical care and failed to intervene. (Fourth Am. Compl. ¶ 43; *see also* Pl.'s Resp. to Williams' Mot. at 7-8.) A more developed factual record might defeat this claim, but the allegations are sufficient to state a claim for deliberate indifference.

### E. Count IV: Intentional Infliction of Emotional Distress

Count IV, which alleges intentional infliction of emotional distress (IIED), is the subject of both Defendants' motions to dismiss. To prevail on a claim for IIED under Illinois law, Piercy must show "(1) that the [Defendants'] conduct was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional distress." *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" *Swearnigen-El v. Cook Cty. Sheriff's Dept.*, 602 F.3d 852, 864 (7th Cir. 2012) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill.2d 1, 607 N.E.2d 201, 211 (1992)).

Plaintiff has sufficiently alleged a complaint for deliberate indifference to his serious medical needs against Williams and the Wexford Defendants (discussed above). The allegations supporting his deliberate indifference claim are sufficient to support his IIED claim, as well. *See Awalt v. Marketti*, 74 F. Supp. 3d 909, 942 (N.D. Ill. 2014) (finding that evidence creating an issue of fact on plaintiff's deliberate indifference claim also supports denial of motion for summary judgment on IIED claim); *Doe ex. rel Doe. v White*, 627 F. Supp. 2d 905, 921 (C.D. Ill. 2009) (holding that plaintiffs' allegations of deliberate indifference to pleas for protection were sufficient to support a claim for IIED under federal notice pleadings).

### F. Counts V and VI: Wrongful Death and Survival

Williams and the Wexford Defendants both argue that Counts V and VI should be dismissed. For its part, Wexford's position is based exclusively on Piercy's failure to file a § 2-

622 Physician's Certificate of Merit for each of the Wexford Defendants named for the first time in the Third Amended Complaint. (Wexford's Mem. at 8.) Although this issue has been the subject of repeated controversy in this case,[10] Plaintiff has inexplicably failed to file the necessary certificates relating to the newly-named Wexford Defendants. This is particularly disappointing in light of the history: Piercy responded to a similar argument from Williams by filing a § 2-622 certificate related to him. The court is loath to foreclose claims that are otherwise potentially meritorious for such a technical failure, but as this is not the first time the issue has been raised, the court will allow Plaintiff 21 days to file § 2-622 certificates for any Defendants for whom he has not already filed such a certificate. Failure to do so will result in the dismissal of any claims sounding in medical malpractice against those Defendants for whom he has not filed a certificate.

Williams' motion to dismiss goes a step further. It argues that Piercy's wrongful death and survival claims are inadequately pleaded. To prevail on a malpractice claim, a plaintiff must establish "the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care." *Purtill v. Hess*, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867, 872 (1986). Piercy must also plead and ultimately prove that there was a physician-patient relationship. *Heigert v. Riedel*, 206 Ill. App 3d. 556, 563, 565 N.E.2d 60, 65 (Ill. App. Ct. 1990).

Williams argues that Piercy "does not allege a physician-patient relationship, nor does [he] allege any act of negligence on the part of Dan Williams." (Williams' Mem. at 11.) Piercy disagrees with the characterization of these claims as malpractice claims, but argues that they are adequately pleaded in any case. Specifically, he contends that a physician-patient relationship was established when Williams prescribed medication for Piercy and consulted with

---

[10] When other Defendants raised similar arguments in early 2015, the court ordered that Williams file the relevant § 2-622 certificates within thirty days. (R. 69.) He did so then.

14

Warkins about Piercy's condition. (Pl.'s Resp. to Williams at 12.) Furthermore, the allegations underlying Piercy's deliberate indifference and failure-to-intervene claims (discussed above) are sufficient to state a claim that Williams failed to comply with the applicable standard of care. *See Wade v. Castillo*, 658 F. Supp. 2d 906, 918 (W.D. Wis. 2009) ("[T]he standard for deliberate indifference is substantially higher than for negligence in a medical malpractice claim." (citing *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996)). Williams' motion is denied as to Counts V and VI.

### G. Count VII: *Respondeat Superior*

Finally, the Wexford Defendants argue that Piercy cannot prevail on his *respondeat superior* claim. *Respondeat superior* does not apply to claims arising under § 1983. *Kinslow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008). The Wexford Defendants' only argument regarding Piercy's *respondeat superior* theory as it relates to his state-law claims is that "Plaintiff has failed to . . . successfully allege a state law claim." This argument fails for reasons already stated. As Piercy has sufficiently pleaded claims for IIED, wrongful death, and survival, Count VII survives as well.

## CONCLUSION

For the foregoing reasons, the Wexford Defendants' motion to dismiss [215] is granted in part and denied in part. Williams' motion to dismiss [156] is denied. The Plaintiff's motion for a finding of good faith [167] is denied. ACH's motion for leave to file a contribution claim against WJC [184] is denied in part and granted in part, and its motion for leave to file amended affirmative defenses [263] is granted.

ENTER:

Dated: April 29, 2016

_____
REBECCA R. PALLMEYER
United States District Judge