UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AARON PIERCY, as Administrator of the Estate of Dale Piercy, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | No. 14 CV 7398 |
| JULIE WARKINS, DAN WILLIAMS, and ADVANCED CORRECTIONAL HEALTHCARE, INC., | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Aaron Piercy brings this suit as the administrator of the estate of his father, Dale Piercy (*see* Defs.' Statement of Undisputed Material Facts ("DSOF") [346] ¶ 2.), who died in the custody of the Illinois Department of Corrections ("IDOC") on October 19, 2013 at the age of 54[1]. (Coroner Report, Ex. 3 to Mot. for Summ. J. [345-3] at P000032.)  Piercy entered the Whiteside County Jail ("WCJ") in late September and was later transferred to Stateville Correctional Center, Northern Reception and Classification Center ("Stateville NRC").  While at WCJ, Plaintiff claims, Piercy complained that he was vomiting blood.  Plaintiff claims Piercy made these complaints to Defendant Julie Warkins, a nurse employed by Defendant Advanced Correctional Healthcare ("ACH"), which provided medical care at WCJ.  Warkins conferred with Defendant Dan Williams, a physician assistant with ACH who worked offsite.  Warkins and Williams gave Piercy medication for acid reflux, and did not tell staff at Stateville NRC about Piercy's complaints when he was transferred there.  Two weeks after the transfer, Piercy died from gastrointestinal bleeding.

Plaintiff alleges several causes of action against Warkins and Williams.  Some are complaints under 42 U.S.C. § 1983: deliberate indifference, conspiracy, and failure to intervene.  Plaintiff also alleges state law claims of medical malpractice, and intentional infliction of

---

[1]     The court refers to Aaron Piercy as "Plaintiff," and Dale Piercy as "Piercy."

emotional distress. Plaintiff further seeks to hold ACH liable for the constitutional violations and the state law claims.

Defendants have moved to bar certain of Plaintiff's expert testimony, and have moved for summary judgment. For the reasons stated below, the motion to bar the expert testimony is denied and the motion for summary judgment is granted in part and denied in part.

## BACKGROUND

### I.    Factual Background

#### A.    Piercy's Incarceration

Aaron Piercy brings this survival action as the administrator of Dale Piercy's estate. Dale Piercy entered WCJ on September 25, 2013. (Pl.'s Resp. to DSOF [365] ¶ 9.[2]) At WCJ, a correctional officer performed an intake medical screening, where Piercy reported that he had acid reflux and took Pepcid, a medication, but that he did not bring any medications with him and was "not under the care of any physician."[3] (DSOF ¶ 10; Ex. 1 to Mot. for Summ. J. [345-1] at Whiteside 6–7.)

ACH had a contract with Whiteside County to provide medical care to detainees at WCJ.[4] (Id. at ¶ 1.) As part of its contract, ACH hired Julie Warkins, a licensed practical nurse ("LPN"), to work at the jail for 35 hours per week. (Pl.'s Resp. to DSOF ¶ 1; see Ex. 49 to Pl.'s

---

[2]    Defendants submitted a "reply" to Plaintiff's responses to Defendants' Local Rule 56.1 statement of facts with a general complaint about some forty of Plaintiff's responses as not contradictory, containing legal arguments, adding additional facts, or lacking citation, as well as specific complaints about four facts. Defendants do not, however, request any specific relief for these alleged violations. None of the complaints about the four specific responses are relevant to this opinion. The court will exercise its discretion to consider Plaintiff's other responses that are cited here, and need not address Defendants' complaints about the other statements.

[3]    Piercy had previously been detained at WCJ from July 13 to July 15, 2013. (Pl.'s Resp. to DSOF ¶ 6.) Defendants apparently consider this earlier WCJ stay relevant because when Piercy arrived at the jail on July 13, a correctional officer performed a medical screening, during which Piercy reported that he had a "seasonal ulcer," but was not currently taking medications or "under a doctor's care." (Id. at ¶ 7.)

[4]    In 2013, WCJ had an average daily population of 74 detainees. (Dep. of Tim Erickson, Ex. 25 to PSOAF [367-26] 14:3–10.)

Statement of Additional Facts ("PSOAF") [367-50]; *see also* 225 ILCS 65/55-30 (defining licensed practical nurse).) ACH also hired Dan Williams, a physician assistant, to visit the jail once every other week and to be available for phone consultation 24 hours per day. (*See* Pl.'s Resp. to DSOF ¶ 1; Ex. 45 to PSOAF [367-46] at ACH0425; Ex. 48 to PSOAF [367-49].)

Before Piercy was transferred to Stateville NRC, Warkins filled out a Health Status Summary form, a form that WCJ used to give IDOC information on an inmate's medical condition.[5] (Pl.'s Resp. to DSOF ¶ 11.) Warkins used the information from Piercy's intake medical screening to fill out the form (*id.*); Warkins wrote on the Health Status Summary that (1) Piercy had acid reflux problems, (2) he took Pepcid, and (3) he needed medical follow-up care; she did not specify what kind of care he needed. (Ex. 24 to PSOAF [367-25].)

The parties dispute what Piercy told Warkins about his medical condition while at WCJ. Another inmate, Brandon Simester, testified that he heard Piercy tell Warkins that he had been vomiting and coughing up blood on September 26, the day after he entered the jail. (Dep. of Brandon Simester, Ex. 6 to PSOAF ("Simester Dep.") [367-7] 74:3–75:12.) Simester claims that Piercy also asked for some antacid to help him eat. (*Id.* at 75:5–19.) According to Simester, Warkins wrote Piercy's name on her hand and told him she would get back to him. (*Id.* at 74:5–18, 131:8–16.) Simester and another inmate, William Elder, claim that Piercy spoke to Warkins several more times, as well. (*Id.* at 77:11–78:1; Dep. of William Elder, Ex. 7 to PSOAF [367-8] 34:24–35:14.) Simester testified that during one of these encounters, Piercy repeated that he was vomiting blood and was in pain; Simester claims that Warkins said she would "see what she could do." (Simester Dep. 78:8–79:15.) Warkins also apparently told Piercy to drink water. (*Id.* at 152:4–10.) One correctional officer, John Willhite, claims that Piercy told him he was spitting blood at some point during his stay at WCJ, but when Willhite offered to take him "up front" (presumably to the nurse), Piercy declined. (Dep. of John Willhite, Ex. 10 to PSOAF

---

[5] Though Plaintiff denies all but a portion of this statement, he cites to no evidence contradicting Defendants' statement that the Health Status Summary form was used to give IDOC information on an inmate's medical condition.

("Willhite Dep.") [367-11] 6:7–24, 63:1–14.) Willhite claims that Piercy said that "it wasn't a big deal." (*Id.* at 63:1–14)

Warkins claims she spoke to Piercy briefly on September 27, while she gave medication to other detainees. (DSOF ¶ 14.) She contends that Piercy told her that the jail food "didn't agree with him," said he took antacid for acid reflux, and requested medication. (*Id.*; Dep. of Julie Warkins, Ex. 11 to PSOAF ("Warkins Dep.") [367-12] 78:3–80:23.) According to Warkins, Piercy did not know the name of the medication—he called it only "the purple pill"[6] (*id.* at 118:18–120:13), but he did specifically request Mylanta.

Warkins claims that she took Piercy's vital signs (DSOF ¶ 15), and recalls that she recorded them and Piercy's request for medication on a Protocol Medication Verification Form.[7] (Warkins Dep. 103:3–105:20.) This form is dated September 27, 2013, and is signed by both Warkins and Williams. (Ex. 1 to Mot. for Summ. J. at Whiteside 2.) On this form, which Defendants have submitted as an exhibit, she wrote that he requested Omeprazole, a drug used to treat acid reflux, rather than Mylanta. (*Id.*); *Omeprazole*, DORLAND'S MEDICAL DICTIONARY, https://dorlands.com/def.jsp?id=100074776 (last visited Apr. 11, 2017). Though Warkins admits that she did not document precisely what Piercy said, she confirmed that she recorded his vital signs and his request for medication. (Pl.'s Resp. to DSOF ¶ 15; Warkins Dep. 104:17–22.) Defendant Dan Williams explained that the form lists both medications that an inmate requests or is taking and medications that health care professionals provide or recommend. (Dep. of Dan Williams, Ex. 19 to PSOAF ("Williams Dep.") [367-20] 118:3–119:18.) Given that Williams later did prescribe Omeprazole to Piercy, it may be that the

---

[6] Warkins testified that she does not know what this pill was (Warkins Dep. 82:9–11), though an Internet search suggests the "purple pill" is Nexium, a heartburn medication. NEXIUM, https://www.purplepill.com/ (last visited Apr. 24, 2017.)

[7] Plaintiff disputes that Warkins took Piercy's vital signs, citing Warkins's testimony that she was not permitted to question inmates about their health in the cellblock, and inmate Simester's testimony that Piercy never left the cellblock. (Pl.'s Resp. to DSOF ¶ 15.) Plaintiff does not address, however, the fact that vital signs were recorded on the Protocol Medication Verification Form and presents no evidence that the vital signs may have been recorded later.

medication notes on this form were filled in *after* Warkins's conversation with Williams (see below), rather than based on Piercy's request.

After her contact with Piercy, Warkins called Williams;[8] Defendants claim that she relayed her version of Piercy's complaint (the request for medicine and that the food did not agree with him). (DSOF ¶ 16.) Plaintiff asserts that Warkins "conveyed to Williams everything that Piercy had told her" (Pl.'s Resp. to DSOF ¶ 16–17), but the evidence does not support this: Warkins testified specifically to what she told Williams—that Piercy requested antacid and said the food did not agree with him—she did not testify that she told Williams "everything that Piercy had told her." Warkins also testified that if a patient told her that he was vomiting blood, this would be an "emergency," and she would call a doctor. (Warkins Dep. 200:5–16.) Williams, too, agreed that vomiting blood is a "life-threatening condition" that cannot "be ignored." (Williams Dep. 150:15–22.) At his deposition, however, Williams did not recall prescribing Omeprazole, though Defendants admit that he did.[9] (Williams Dep. 122:4–124:13, 128:6–130:7; Defs.' Resp. to PSOAF [372] ¶ 20.) Before Defendants made this admission, Williams testified that if he knew that a patient was taking Omeprazole, he would have wanted to know whether the patient had bloody vomit. (Williams Dep. 141:14–142:18.)

---

[8]     Williams does not recall this phone call, and he testified that he was on vacation at the time. (Williams Dep. 122:4–124:13.) The jail phone records, however, show a two-and-a-half-minute call between the jail and Williams's home phone number on September 28, just after 10:00 AM (Ex. 14 to PSOAF [367-15] at Whiteside 1026; Ex. 15 to PSOAF [367-16] at 3), and Defendants admit that Williams "did speak to Warkins and prescribe Omeprazole." (Defs.' Resp. to PSOAF [372] ¶ 20.)

[9]     All Defendants are represented by the same counsel in this case, which is acceptable so long as their interests are consistently aligned. *Compare Coleman v. Smith*, 814 F.2d 1142, 1147–48 (7th Cir. 1987) (no conflict of interest where "the claims against the Village and the individual defendants were completely different") *with Ross v. United States*, 910 F.2d 1422, 1432 (7th Cir. 1990) (noting that conflicts between individual defendants and *Monell* defendants can arise and remanding to the district court to examine whether a conflict existed). The court presumes that counsel has evaluated this issue.

Williams ordered that Piercy receive 20 mg of Omeprazole daily, and that he be given Mylanta until the Omeprazole arrived.[10]  The parties dispute whether Piercy received Mylanta on September 27, but it is undisputed that he began receiving Omeprazole on the evening of September 28.  (Pl.'s Resp. to DSOF ¶ 18–19; *see* Ex. 1 to Mot. for Summ. J. at Whiteside 3.) Piercy's medication log has no entry for October 2 and 3, so it is unclear whether he received Omeprazole on those dates.[11]  (Ex. 1 to Mot. for Summ. J. at Whiteside 4.)

On October 4, 2013, Piercy was transferred to Stateville NRC.  (DSOF ¶ 21.)  The parties have many disputes concerning the intake process at Stateville NRC and Piercy's medical care there, none of which are relevant for these motions.  It is undisputed, however, that the only medication Piercy received at Stateville NRC was "a few" Tums.  (*Id.* at ¶ 27.) Plaintiff contends that neither Williams nor Warkins contacted Stateville NRC to inform them of Piercy's complaints or Williams's prescription for Omeprazole.  (Pl.'s Resp. to DSOF ¶ 27.) Warkins admits that she filled out Piercy's Health Status Summary form for IDOC before she saw Piercy and before Williams prescribed Omeprazole.  (DSOF ¶ 11.)  She admits, further, that she did not update it (*id.*), though the form is neither dated nor signed.  (Ex. 24 to PSOAF.) The record is silent as to whether WCJ transmitted the Protocol Medication Verification Form— the form recording that Williams ordered Omeprazole—to Stateville NRC.

The parties agree that over the next several days, Piercy began vomiting with escalating frequency, including bloody vomit.  (DSOF ¶ 29–31.)  Piercy was unable to stand in the shower on October 18 (Pl.'s Resp. to DSOF ¶ 33), and fell from his bunk on October 19.  (DSOF ¶ 34.)

---

[10]  This statement appears in a paragraph with several other factual statements in Defendants' Statement of Facts.  Plaintiff admits to one fact in this paragraph (not this one), and says nothing about the remaining facts.  As Plaintiff cites to no evidence contradicting this fact, the court considers it admitted.  Williams testified that he would not give such a low dose (20 mg daily) of Omeprazole (Williams Dep. 128:6–130:7), but Defendants admit that he did so, and that dosage is reflected on the Protocol Medication Verification Form.  (Ex. 1 to Mot. for Summ. J. at Whiteside 2.)

[11]  Defendants claim that the medication log is blank for October 3 and 4, but the court assumes this is a typographical error given that the medication log itself is in the record and is blank for October 2 and 3.  (Ex. 1 to Mot. for Summ. J. at Whiteside 4.)

Stateville NRC staff brought Piercy to the medical unit, and called an ambulance after Piercy became unresponsive. (*Id.* at ¶ 34–35.) At some point later, Piercy died from gastrointestinal bleeding. (*Id.* at ¶ 36.)

Dr. Michel Humilier, a forensic pathologist, performed a post-mortem examination of Piercy on October 21. (Coroner Report, Ex. 3 to Mot. for Summ. J. at P000031–32.) Dr. Humilier listed the immediate cause of death as "gastrointestinal hemorrhage." (*Id.* at P000031.) Dr. Humilier was unable to identify the cause of the gastrointestinal bleeding. (Dep. of Michel Humilier, Ex. 57 to PSOAF [367-58] 20:4–21.)

### B. ACH Policies and Practices

Plaintiff retained an expert, Dr. Evans, who prepared a report on ACH's practices at WCJ. Dr. Evans reviewed 455 charts of inmates who had been incarcerated in WCJ.[12] (Report of Dr. Nathaniel Evans, Ex. 28 to PSOAF ("Evans Rep.") 5; Dep. of Dr. Nathaniel Evans, Ex. 29 to PSOAF ("Evans Dep.") [367-30] 127:22–128:6.) Dr. Evans opines that the medical records of 107 of those inmates "showed clear evidence of inadequate medical care or no medical care at all." (Evans Rep. 5.) According to Dr. Evans, some of these inmates were not given timely assessments to determine whether they needed care, and a "substantial number of detainees who expressed need for medical attention" apparently did not receive any medical care at all while at WCJ. (*Id.*)

Dr. Evans also reviewed the sworn statements of 20 inmates who were incarcerated in WCJ in 2013 or, in two cases, 2014 and 2015. (*Id.* at 5; Inmate Affidavits, Ex. 30 to PSOAF [367-31] at P017004, P017010.) Dr. Evans does not specify whether he also reviewed the

---

[12] The record is silent on precisely when these inmates were incarcerated:

Q: All right. Let's talk a little bit about the review of the inmate charts. You were provided with medical charts for all of the inmates who were seen at the Whiteside County Jail in 2013, correct?

A: I was provided with the medical charts. Whether that consisted of all the inmates seen in 2013, I don't know. I got a stack of about 450 charts. I didn't choose the charts. They came to me in boxes.

(Evans Dep. 127:22–128:6.)

medical records of these inmates. Dr. Evans specifically describes thirteen cases of what he calls inadequate medical care among these inmates (the names of these inmates have been redacted from his report):

- One inmate told a nurse that he took three medications, but was told he would have to wait to see a psychiatrist before he could have those medications. (Evans Rep. 9.) Months passed before he actually saw a psychiatrist. (*Id.*)

- One inmate made sick call requests for a toothache for more than a month before he received aspirin; he never saw a doctor or dentist. (*Id.*)

- One inmate told a correctional officer that he needed blood pressure medication, but more than two weeks pass before he received the medication, despite back pain, chest pain, and swollen feet. (*Id.*)

- One inmate was denied hypertension and mental health medications for several days. (*Id.* at 10.)

- Another inmate was also denied blood pressure medication. (*Id.*) This inmate also requested a lice examination, which ACH did not perform. (*Id.*)

- One inmate was deprived of medication for restless leg syndrome and depression, and had a urinary tract infection that went untreated for a week. (*Id.*)

- Another inmate complained that she had a cold for two months, but was never examined. (*Id.*)

- One inmate had an ingrown toenail that was treated with antibiotics, which did not help, and ACH never removed the toenail (it was removed after he was transferred to IDOC)—he does not state how long this persisted. (*Id.*; Inmate Affidavits, Ex. 30 to PSOAF at P017006–7.)

- One inmate's complaint of a toothache was not addressed for a month, until he threatened to contact a lawyer. (Evans Rep. 10; Inmate Affidavits, Ex. 30 to PSOAF at P017011.)

- One inmate had a boil that went untreated for a week, after which the inmate had to be hospitalized for several days.  (Evans Rep. 10.)

- One inmate had a staph infection for more than a week, but was not treated.  (*Id.* at 11.)

- Two inmates also observed other inmates who were denied medications or given what they believed were the wrong medications.  (*Id.* at 9, 11.)

### C.    Medical Protocols for WCJ Correctional Officers

Correctional officers used "protocols" as "guidelines for treatment" of certain conditions. Though it appears the protocols were kept in book form, they also included forms for completion by correctional officers and health care professionals.  The record is silent on where these materials were kept or how accessible they were.

An exemplary protocol, and the main one at issue in this case, is Protocol 06-05, titled "Nausea and Vomiting."  (Ex. 41 to PSOAF [367-42] at ACH0316–7.)  The protocol has several sections.  First, there is a space to record the detainee's name, date of birth, allergies, and the date and time.  (*Id.*)  Second, there is a section called "Ask the Detainee," which lists three questions to be asked of the detainee: (1) "How long have you had symptoms?"; (2) "Nauseating or Vomiting?"; and (3) "Injury to area?".  (*Id.*)  After the questions, the protocol says "CALL PHYSICIAN IMMEDIATELY for presence of a large amount of blood, extreme pain or life threatening symptoms[.]"  (*Id.* (emphasis in original.))  The third heading directs: "Examine the detainee" and contains a space to record the detainee's vital signs and record if there is "[d]iscomfort in the upper abdomen and/or chest area[.]"  (*Id.*)  Fourth is a list of treatment instructions and recommended medications.  Fifth, there is a place for "Physician's orders" with a large blank section that can be filled in.  (*Id.*)  Finally, each protocol states:

> These Protocols are designed to assist the staff in the gathering of information to be communicated to the medical staff.  The Protocols are not intended to establish a standard of medical care and are not standing orders.  All treatments must be ordered and approved be a Nurse Practitioner, Physician Assistant or Physician.

(*Id.*)

These protocols appear to be the method for correctional officers and ACH to pass along information about a detainee while recording all relevant facts in a single record. In the first, second, and third sections, correctional officers (who are constantly present at the jail and able to observe the detainee) record information to pass on to the ACH medical professional. The fourth section guides the medical professional in the appropriate treatment. The fifth section enables the medical professional to document his or her treatment order, and communicate it to the correctional officers on the same form, who can then implement the treatment. The protocol is thus a guide for ACH medical staff, but requires input from correctional officers to be used properly. In the terminology of the parties, the correctional officers "complete" the protocol (that is, fill out the information requested in the first, second, and third sections), but it is ACH medical staff who actually use them to guide decisions.

There is another protocol at issue in this case, however: Protocol 00-02, titled "Automatic Physician Contact." (Ex. 5 to Dep. of Curtis Ebersohl ("Ebersohl Dep."), Ex. 9 to Mot. for Summ. J. [345-9] at ACH0231.) This protocol has only one section, which has the heading: "[t]he physician will be automatically contacted for detainees with the following problems[.]" (*Id.*) The protocol then lists several conditions, one of which is "Vomiting Blood: **See Protocol 06-05**[.]" (*Id.* (emphasis in original).) This protocol, presumably, also guides the correctional officers themselves in deciding whether to contact the ACH medical staff.

The parties dispute who established the protocols: Plaintiff contends that ACH required jail staff to use them, but Defendants claim that while ACH recommended the protocols, "[t]he Sheriff has to approve and implement them." (DSOF ¶ 43; Pl.'s Resp. to DSOF ¶ 42–43.) The jail administrator, Tim Erickson, testified "[w]e have a protocol book that ACH gave us with certain protocols that we have to follow." (Dep. of Tim Erickson, Ex. 25 to PSOAF ("Erickson Dep.") [367-26] 6:19–7:8, 44:23–24.) The parties agree that ACH provided some training about when and how to consult the protocols, though it is unclear how much or what the training entails. (Defs.' Resp. to PSOAF [372] ¶ 50; Pl.'s Resp. to DSOF ¶ 48–49.) Defendants contend

that "[t]he officers were taught to call the provider every time a protocol was completed" (DSOF ¶ 50), but Plaintiff disputes this; he asserts that "officers expected the protocols to inform them as to whether a call to the provider was necessary." In fact, Tim Erickson, the jail administrator, testified:

> The thing about contacting the physician, the protocols themselves will tell you on there whether you're suppose[d] to contact the physician or not.
>
> So even without looking at that page, if you look up extreme bleeding, it's going to tell you in that protocol, call the doctor.

(Erickson Dep. 104:11–16.) Curtis Ebersohl, another correctional officer, testified that it was a "judgment call" about whether to call a physician after completing the first section of the protocol. (Ebersohl Dep. 5:15–6:3, 109:20–110:5.) Whatever the preferred practice may have been, it is undisputed that "no protocol form was ever used in connection with Piercy." (PSOAF [367] ¶ 56.) The court concludes that no correctional officer ever consulted the relevant protocol forms for bloody vomit, performed the preliminary inquiries, or consulted an ACH employee for the part of the form that requires physician input.

### D. Supervision of Physician Assistant Dan Williams

Illinois requires a physician assistant to be supervised by a physician. 225 ILCS 95/7. Illinois law also requires a written supervision agreement that "shall describe the working relationship of the physician assistant with the supervising physician[.]" 225 ILCS 95/7.5(a). This agreement "must be available to the [Illinois Department of Financial and Professional Regulation] upon request from both the physician assistant and the supervising physician." *Id.* Plaintiff complains that no agreement with Williams's supervising physician was produced in discovery, but Defendants claim that the law does not require that the parties "retain[] [the agreement] for any period of time." (Defs.' Resp. to PSOAF ¶ 59.) In 2005, Williams was involved in the treatment of a patient, for which he was sued for malpractice (the court does not

know when the suit commenced); in 2009, he settled the suit, and in 2011 he was reprimanded and fined by the Illinois Department of Financial and Professional Regulation.[13] (PSOAF ¶ 58.)

At WCJ, Williams was originally supervised by Dr. Gregory Rakestraw, and later by Dr. Karen Butler, but he does not recall when the supervisor change occurred or whether it was before, during, or after September 2013. (Defs.' Resp. to PSOAF ¶ 60; Williams Dep. 74:22–75:12.) Williams testified that he did not have regularly scheduled phone calls or meetings with his supervising physician, nor did he receive performance reviews. (Williams Dep. 75:13–15, 76:2–77:2.) He would, however, contact the physician with questions or to get suggestions about how to handle a patient's medical problems. (*Id.* at 74:12–21, 77:3–11.) Williams testified that it was "rare" for his supervising physician to call him. (*Id.* at 77:3–11.)

Williams prepared charts to document the conditions of individual patients and the treatment he provided; Dr. Rakestraw reviewed some of them, and, according to Williams, would typically review five to ten charts per month.[14] (*Id.* at 77:12–80:3.) Williams received feedback on the documentation in his charts from time to time. (*Id.* at 78:18–79:21.) He recalled notations such as "excellent documentation," "thorough," and "make sure you complete a full mental status." (*Id.* at 79:3–21) He testified that he never received feedback that caused him to "change [his] practices." (*Id.*) According to Norman Johnson, the CEO of ACH, no one from ACH ever "shadow[ed]" Williams at WCJ. (Johnson Dep. 14:2–9, 212:1–2.)

## II.    Procedural Background

On September 23, 2014, Plaintiff filed this lawsuit, naming fifteen defendants, many of whom were unknown. (*See generally* Compl. [1].) Plaintiff's most recent complaint, the fourth amended complaint, names more than one hundred defendants associated with Whiteside County, IDOC, and the medical contractors that operate at WCJ and Stateville NRC (ACH and

---

[13]    Defendants object to this statement but do not deny it (Defs.' Resp. to PSOAF ¶ 58), so the court deems it admitted.

[14]    These charts do not appear in the record.

Wexford Health Services, respectively).  (*See generally* Fourth Am. Compl. [250].)  Plaintiff has settled with all defendants other than ACH, Warkins, and Williams.  (Defs.' Mot. for Summ. J. [345] 1.)

Against Warkins and Williams, Plaintiff asserts the following causes of action: deliberate indifference in violation of 42 U.S.C. § 1983, conspiracy to violate 42 U.S.C. § 1983, failure to intervene in violation of 42 U.S.C. § 1983, and intentional infliction of emotional distress. Plaintiff also pleads "wrongful death," in which Plaintiff complains of Defendants' "negligence and/or willful and wanton conduct."  With respect to an earlier amended complaint, the court construed the "wrongful death" claim as one for medical malpractice, and required that Plaintiff file the appropriate affidavit required for medical malpractice claims under Illinois law.  (Minute Order [69], Jan. 23, 2015); 735 ILCS 5/2-622.  Both parties have accordingly considered this claim as one for medical malpractice, and the court will continue to do so as well.  Plaintiff alleges that ACH is liable for the § 1983 claims because it had policies or practices that were the moving force behind the deliberate indifference, and for the state law claims under *respondeat superior*.  Plaintiff also seeks punitive damages.

### III.    Plaintiff's Proposed Expert Testimony

Plaintiff initially disclosed two experts: Dr. David Shapiro and Dr. Nathaniel Evans.  (Ex. 1 to Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions [341-1].)  As described above, Dr. Evans reviewed medical records and sworn statements of other inmates; he intends to testify regarding ACH's policies and practices.  Dr. Shapiro opines that both Williams and Warkins fell below their respective standards of care while treating Piercy.  (Report of Dr. David Shapiro ("Shapiro Rep."), Ex. 1 to Pl.'s Resp. to Mot. to Strike Rebuttal Experts [351-1] 9.) According to Dr. Shapiro, Warkins and Williams should have acted promptly to determine the cause of Piercy's bleeding, including "an urgent referral to a gastroenterologist."  (*Id.* at 4–6.) Dr. Shapiro also opined that "Omeprazole is necessary but insufficient as the only treatment in the management of upper of GI bleeding.  Furthermore, as there is the potential to mask

13

symptoms despite ongoing bleeding, the administration of omeprazole in the absence of the appropriate evaluation is a dangerous combination." (*Id.* at 7.)

Defendants then disclosed at least five[15] experts and provided their respective reports: Dr. Stephen Bolesta, Dr. Michel Uzer, Dr. Randall Stoltz, Physician Assistant Janet Furman, and Nurse Betty Rogers. (Pl.'s Resp. to Mot. to Strike Rebuttal Experts ("Pl.'s Expert Resp.") [351] 2.) Dr. Bolesta and Dr. Uzer both opined on the cause of Piercy's death. Dr. Bolesta opines that the cause of death listed in the autopsy report is "incomplete," and that his review of the medical records leads him to conclude that Piercy "suffered from an acute event resulting in significant blood loss in and around the time of his death[.]" (Report of Dr. E. Stephen Bolesta, Ex. 4 to Pl.'s Expert Resp [351-4] 2.) Dr. Uzer opined first that Warkins's and Williams's treatment of Piercy met the standard of care. (Report of Dr. Michael Uzer, Ex. 3 to Pl.'s Expert Resp. [351-3] 2) Second, he opined that Piercy did not experience a hemorrhage until after he arrived at Stateville NRC. (*Id.* at 4.) Finally, he concludes that the cause of Piercy's bleeding was a Dieulafoy lesion.[16] (*Id.*) Rogers opined that "the nursing standard of care required Nurse Warkins to 'collect' information from the Dale Piercy [sic] then 'collaborate' with PA Dan Williams so a decision could be made and his orders carried out[,]" and that Warkins met this standard of care. (Report of Betty Rogers, Ex. 5 to Pl.'s Expert Resp. ("Rogers Rep.") [351-5] 2–3.)

Plaintiff disclosed four experts in rebuttal: Dr. Shapiro, Dr. James Filkins, nurse Sylvia Speller, and Dr. Michael Humilier, who performed Piercy's autopsy. (Ex. 2 to Defs.' Mot. to

---

[15]     In their motion, Defendants assert that they disclosed ten other experts, in addition to the five listed in Plaintiff's brief. (Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions 1–2.) The court does not have a copy of Defendants' Rule 26(a)(2) disclosures, and only has copies of the reports from Dr. Uzer (Ex. 3 to Pl.'s Resp. to Mot. to Strike Rebuttal Experts [351-3]), Dr. Bolesta (Ex. 4 to Pl.'s Resp. to Mot. to Strike Rebuttal Experts [351-4]), and Nurse Rogers (Ex. 5 to Pl.'s Resp. to Mot. to Strike Rebuttal Experts). More importantly, none of Plaintiff's rebuttal experts appear to have reviewed any of Defendants' expert reports other than those of Dr. Uzer and Dr. Bolesta. The court therefore assumes that any of these other ten expert reports, if they exist, would not be relevant for this motion.

[16]     A Dieulafoy lesion is "an abnormally large submucosal artery[.]" *Dieulafoy Lesion*, DORLAND'S MEDICAL DICTIONARY, https://dorlands.com/def.jsp?id=120853780 (last visited Apr. 11, 2017).

Strike and Bar Rebuttal Experts and Opinions [341-2].)  Dr. Shapiro provided a new rebuttal report, for which he reviewed Dr. Uzer's and Dr. Bolesta's reports, and opined that Piercy's medical records contained evidence "strongly suggestive of a gastric ulcer." (Rebuttal Report of Dr. David Shapiro, Ex. 6 to Pl.'s Expert Resp. [351-6] 1.)  He added that he disagreed with Dr. Uzer's "characterization of the bleeding pattern of these lesions" as indicating a Dieulafoy lesion, and that the "[t]he clinical presentation is most consistent with gastrointestinal bleeding from a gastric ulcer." (*Id.* at 2.)

Dr. Filkins also reviewed Dr. Uzer's and Dr. Bolesta's reports. (Report of Dr. James Filkins, Ex. 7 to Pl.'s Expert Resp. ("Filkins Rep." [351-7] 1)  He stated that he "[could not] endorse Dr. Uzer's opinion that the gastrointestinal hemorrhage that killed Dale Piercy was necessarily from an arterial source" (a Dieulafoy lesion). (*Id.* at 2.)  Contrary to Dr. Uzer, Dr. Filkins's opinion "as a forensic pathologist, to a reasonable degree of medical certainty, is that bleeding from a venous source—a vein or veins—could also result in the large amount of blood that was found in Dale Piercy's digestive tract at autopsy." (*Id.*)  He pointed out that "Dr. Uzer himself concedes [that] an erosive lesion, such as an ulcer, could wear away the lining of the stomach, ultimately compromising an artery and causing the bleeding observed in Dale Piercy." (*Id.*)  According to Dr. Filkins, "an ulcer cannot be ruled out as the source of the bleeding, and in fact is far more likely to be the source of a GI bleed than the very rare Dieulafoy's Lesion[.]" (*Id.* at 3.)

Plaintiff retained Nurse Speller to opine on the nursing standard of care.  Nurse Speller asserted that Warkins fell short of that standard. (Report of Sylvia Speller, Ex. 8 to Pl.'s Expert Resp. ("Speller Rep.") [351-8] 1.)  First, Nurse Speller opines, if Warkins knew Piercy was vomiting blood, she should have arranged for "immediate clinical evaluation" by a physician or phyisician assistant. (*Id.* at 1–2.)  Even if Warkins only knew that Piercy complained about the food and wanted medication, the standard of care required a follow-up assessment, according to Speller. (*Id.* at 2.)  Finally, she opines that Warkins fell short of the standard of care by failing

to document her encounter with Piercy in his medical records. (*Id.*) Dr. Humilier, who performed Piercy's autopsy, did not provide a written report for trial, but his postmortem report is in the record. (Ex. 2 to Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions; Coroner Report, Ex. 3 to Mot. for Summ. J. at P000031.)

Defendants have moved to strike Dr. Shapiro's rebuttal report, Dr. Filkins's report, and Nurse Speller's report, and to bar them from testifying as rebuttal experts. (Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions ("Defs.' Mot. to Strike") [341].) Defendants have also moved for summary judgment on all claims except for the claim that Warkins was deliberately indifferent. For the reasons stated below, the court denies the motion to strike the expert reports and bar the rebuttal expert witnesses, and grants the motion for summary judgment in part and denies it in part.

## DISCUSSION

### I. Motion to Strike Expert Reports and Bar Expert Witnesses

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) (quoting *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001)). "Testimony offered only as additional support to an argument made in a case in chief, if not offered 'to contradict, impeach or defuse the impact of the evidence offered by an adverse party,' is improper on rebuttal." *Id.* (quoting *Grintjes*, 237 F.3d at 879). Defendants have moved to strike the rebuttal reports of Dr. Shapiro, Dr. Filkins, and Nurse Speller as improper rebuttal and prejudicial. The court addresses Dr. Shapiro's and Dr. Filkins's rebuttal reports here, but reserves discussion of Nurse Speller's report for the section of the opinion addressing Plaintiff's state law malpractice claim.

Defendants claim that Dr. Shapiro's and Dr. Filkins's rebuttal reports are not truly rebuttal, but are instead intended to strengthen Plaintiff's case-in-chief because they both purport to identify the source of Piercy's bleeding as an ulcer. (Defs.' Mot. to Strike 4–7.) No

part of Plaintiff's case could identify the source of the bleeding before the rebuttal reports, and Dr. Shapiro in fact testified initially that he could not determine the cause of Piercy's bleeding and could not say whether it was an ulcer. (Dep. of Dr. David Shapiro, Ex. 4 to Defs.' Mot. to Strike [341-4] 86:21–88:22.)

Defendants analogize to *Bowman v. International Business Machine Corp.*, No. 1:11-CV-0593-RLY-TAB, 2012 WL 6596933, at *6 (S.D. Ind. Dec. 18, 2012), *objections overruled*, No. 1:11-CV-0593-RLY-TAB, 2013 WL 1857192 (S.D. Ind. May 2, 2013). There, the plaintiffs disclosed two expert witnesses, and after the defendants disclosed their expert reports, the plaintiffs provided two "reply" reports from the same witnesses, using different methodologies for their calculations than the initial reports. *Id.* at *1, 6. The court struck the reports, holding that "[a]lthough [the experts'] replies cover the same topics and to some extent respond to Defendants' experts," the change in methodology was improper for a rebuttal report. *Id.* at *6–7.

In the court's view, Defendants have mischaracterized Dr. Shapiro's rebuttal report and Dr. Filkins's report. Neither Dr. Shapiro nor Dr. Filkins opine with reasonable medical certainty that the cause was in fact an ulcer. Instead, they rebut Dr. Uzer's opinion that the cause was a Dieulafoy lesion. They point to an ulcer as a potential cause that is supported by enough evidence to contradict Dr. Uzer's opinion that another cause can be confirmed. To accomplish this, both of Plaintiff's experts muster the evidence that the cause of the bleeding could be an ulcer. Dr. Shapiro asserts that there is evidence "strongly suggestive of" and "most consistent with" an ulcer, though he does not offer an opinion with reasonable medical certainty that an ulcer did cause the bleeding. He then critiques Dr. Uzer's opinion. Dr. Filkins similarly criticizes Dr. Uzer's conclusion, precisely because he finds that an ulcer was sufficiently likely that Dr. Uzer's endorsement of a different cause appears inaccurate. Dr. Filkins does not say it was

definitely an ulcer—he states it "could also" be an ulcer. (Filkins Rep. 2.) They both conclude that there are too many possible causes to identify one with reasonable medical certainty.[17]

The court concludes this is proper rebuttal expert testimony. Both opinions bolster Dr. Shapiro's initial opinion that the cause of the bleeding cannot be identified with reasonable medical certainty based on the medical records. Moreover, they explicitly contradict Dr. Uzer's opinion that he can identify the source. Defendants' citation to *Bowman* is misplaced—Dr. Shapiro did not change his methodology nor did he "abandon[] his earlier opinion." (*See* Defs.' Mot. to Strike 8.) In his initial report, Dr. Shapiro pointed to a number of tests that were not performed on Piercy while he was still alive to determine the source of the bleeding (Shapiro Rep. 6–7); as a result, he does not identify any such cause. True, Dr. Shapiro's rebuttal report describes Piercy's records in detail, which he had not done in his initial report. But again, this description is aimed directly at Dr. Uzer's report and does not change Dr. Shapiro's initial conclusion that the source of the bleeding could not be identified. Dr. Filkins's report is a similar rebuttal to Dr. Uzer's conclusion. Dr. Filkins describes the evidence supporting an ulcer as the cause, concluding that "an ulcer cannot be ruled out." (Filkins Rep. 3.) This rebuts Dr. Uzer's opinion identifying a Dieulafoy lesion as the cause with reasonable medical certainty.

## II.    Motion for Summary Judgment

### A.    Deliberate Indifference

Defendants move for summary judgment on the deliberate indifference claim against Williams, but not Warkins. A plaintiff may recover for deliberate indifference if he suffered from a sufficiently serious medical condition, and if the defendant was deliberately indifferent to the condition, which requires the defendant to "*actually* kn[o]w of and disregard[] a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), *as amended* (Aug. 25, 2016) (emphasis in original). Defendants agree that it is disputed whether Piercy's condition was

---

[17]    The parties do not explain why it matters whether the cause of Piercy's death was a Dieulafoy lesion. The court can only speculate that a Dieulafoy lesion either would not have been present or detectable while Piercy was still at WCJ, or would have been untreatable.

sufficiently serious; their sole argument is that it is undisputed that *Williams* knew only that Piercy complained about the food and requested an antacid, not that Piercy was vomiting blood.

Defendants concede that it is disputed whether Warkins knew that Piercy was vomiting blood. (Defs.' Reply in Supp. of Summ. J. ("Summ. J. Reply") [371] 2.) Yet they claim that it remains undisputed that she did not tell Williams about any bloody vomit, because she testified that she did not, and there is no direct evidence contradicting this testimony. (*Id.*) According to Defendants, "that inference [that Warkins told Williams about the bloody vomit if she knew about it] cannot be made where there is direct testimony that the statements did not occur." (*Id.*) Defendants contend that this inference would be "speculation." (*Id.*)

This is incorrect. Circumstantial evidence may always be considered, and in some circumstances has more weight than direct evidence. *DW Data, Inc. v. C. Coakley Relocation Sys., Inc.*, 951 F. Supp. 2d 1037, 1053 (N.D. Ill. 2013). "[T]he finder of fact can use common sense to evaluate what reasonably may be inferred from circumstantial evidence." *Id.* (internal citation and quotation marks omitted). A reasonable jury could (1) believe the evidence that Warkins knew that Piercy was vomiting blood, (2) observe that Warkins called Williams, after which Williams prescribed medication for Piercy (medication that he admits would cause him to ask about blood in vomit), and (3) infer that Warkins told Williams everything she knew about his condition, including that he was vomiting blood.

In *Petties*, a prisoner alleged that two doctors employed by a private medical care contractor were deliberately indifferent to his need for treatment of a ruptured Achilles tendon. 836 F.3d at 726. The doctor denied knowing that he exposed plaintiff to harm by failing to immobilize his foot, and the district court granted summary judgment in favor of the doctor. *Id.* Reversing, the Seventh Circuit concluded that a reasonable jury could have inferred from circumstantial evidence that the doctor was aware of the need for mobilization—indeed, that need was reflected in the prison medical protocols that the doctor implemented—but chose not to provide plaintiff with a splint or boot. *Id.* at 731. The Court of Appeals identified

circumstantial evidence from which a jury could infer that the doctor knew that failing to immobilize the plaintiff's foot would cause severe pain, as well: (1) the doctor's testimony about normal treatment for a ruptured tendon, (2) the doctor's failure to provide a boot until "an outside doctor documented the importance of immobilization in writing[,]" and (3) the doctor's comment that surgery (recommended by an outside specialist) would be too expensive, suggesting that treatment decisions were "dictated by cost . . . rather than medical judgment." *Id.* at 732–33.

Defendants attempt to distinguish *Petties* by asserting that whether Williams was told that Piercy was vomiting blood is "an objective fact," where the issue in *Petties* was the doctors' belief about the plaintiff's injury. The court does not find this distinction compelling; in both cases, the question is whether the medical professional was aware of the danger to the patient. A jury can draw any inference reasonably supported by the evidence. A reasonable jury could find Williams knew of a serious risk to Piercy and was deliberately indifferent.

Defendants then argue that Williams is entitled to qualified immunity. Defendants acknowledge that the Seventh Circuit "has, at least in dicta, foreclosed the qualified immunity defense for jail medical contractors," but they believe that courts have not "conclusively addressed this issue." (Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Summ. J. Mem.") [347] 4.) Even if it is dicta, the court finds the Seventh Circuit's statement "qualified immunity does not apply to private medical personnel in prisons[,]" *Petties*, 836 F.3d at 734, to be perfectly clear. Defendants also argue that Williams should be entitled to good faith immunity, but they acknowledge that the Supreme Court has not addressed whether such a defense exists. (*See* Defs.' Summ. J. Mem. 4.) Given the clear Seventh Circuit guidance against qualified immunity for private medical contractors, the court will not apply a good faith defense on speculation. Defendants have preserved the issue, but summary judgment is denied on the deliberate indifference claim.

### B.     *Monell* Claim Against ACH

Defendants argue that they are entitled to summary judgment on the *Monell* claim against ACH.[18]   A corporation, such as ACH, can be liable for constitutional violations caused by (1) an express policy, (2) a widespread custom or practice, or (3) a decision by someone with final policy-making authority.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Pittman ex rel. Hamilton v. Cty. of Madison*, 746 F.3d 766, 780 (7th Cir. 2014); *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009).   Courts use the words "moving force" to describe this causation.   *Monell*, 436 U.S. at 694; *Valentino*, 575 F.3d at 674.   Plaintiff argues that ACH is liable under *Monell* because it (1) had a widespread practice of providing constitutionally inadequate medical care, (2) failed to train correctional officers to handle inmates' dire medical needs, and (3) failed to supervise Williams.

### 1.     Widespread Practice of Inadequate Medical Care

Plaintiff alleges that ACH had a widespread practice of providing inadequate medical care to WCJ inmates—in essence, Plaintiff claims that ACH would cut corners in all aspects of providing care.   Plaintiff points to two types of evidence of this alleged practice: (1) expert testimony that many inmates at WCJ received inadequate care, and (2) individual policies and practices at ACH that Plaintiff claims suggest that ACH routinely "cut corners and took improper steps to maximize its profits at the expense of patient safety."  (Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Summ. J. Resp.") [364] 9.)

### a.     Dr. Evans's Testimony

Plaintiff refers to the thirteen inmates at WCJ that Dr. Evans specifically identified as having received inadequate care, as well as his opinion (without specifics) that 107 inmates (out of 455) received inadequate care.   Plaintiff cites to *Awalt v. Marketti*, 74 F. Supp. 3d 909, 925

---

[18]     Though Plaintiff has not raised the issue, there is an open question about whether the *Monell* doctrine applies to private corporations.   *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 790–96 (7th Cir. 2014); *Pindak v. Dart*, 125 F. Supp. 3d 720, 764–65 (N.D. Ill. 2015).

(N.D. Ill. 2014), *supplemented*, 75 F. Supp. 3d 777 (N.D. Ill. 2014), where the plaintiff's expert reviewed the files of inmates who had entered the jail in the three months prior to the plaintiff's incarceration. Twenty-four of these inmates identified medical problems. *Id.* According to the expert, "seven detainees . . . were denied timely access to care or received care that fell far below the standard for correctional health care." In the expert's view, those numbers reflect "a high rate of substandard care that suggested systemic failures in the policies and practices" of the defendant corporation. *Id.*

The plaintiff in *Awalt* argued that the corporate defendant "had an implicit policy of deliberate indifference to the medical care provided to detainees." *Id.* at 939. The court found that a reasonable jury could find such a policy, both because of the expert's findings and because the plaintiff "identified six other detainees who did not receive the medical care or medication they needed" while at the jail. *Id.* at 938–39. These same conditions are present here: Dr. Evans has identified specific inmates that he claims received inadequate care, and has opined that a high percentage of inmates also received untimely or inadequate care.

Defendants argue that the examples of deficient care here are not as serious as those in *Awalt*. (Summ. J. Reply 8.) But Dr. Evans specifically identifies several inmates whose sick call requests were ignored, who were denied medications, or who waited weeks for medical care. These deficiencies are serious and comparable to the problems that the plaintiff's expert identified in *Awalt*, even if not every case is as serious as Piercy's or those in *Awalt*.

Defendants nevertheless minimize the evidence of other episodes of inadequate care. They point out that many of the examples of inadequate medical care that Dr. Evans identified were (1) ACH's failure to assess inmates within three days, which they claim is not required in Illinois, or (2) "related to assessment and following of blood." (*Id.* at 9.) But these circumstances do not blunt the force of Dr. Evans's opinions. Dr. Evans concludes that "allow[ing] detainees to stay in a correctional facility more than three days with no medical evaluation . . . created a situation in which some individuals' medical needs were unmet."

(Evans Rep. 5.) According to Dr. Evans, the problem with the delay in assessment is not simply that the assessment is delayed, but that it causes a delay in actual medical treatment. This is borne out in many of his examples, where inmates did not receive critical medications. The fact that no state law requires a prompt medical evaluation does not require the conclusion that delayed treatment does not violate the Constitution.

As for the "assessment and following of blood" (Summ. J. Reply 9), the court assumes that this refers to Dr. Evans's opinion that many of the failures at WCJ occurred when "inmates with high blood pressure . . . were given no medication for their blood pressure during their incarceration." (Evans Rep. 5.) Defendants do not explain why withholding blood pressure medication is somehow not serious. *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (affirming denial of judgment as a matter of law when "a reasonable jury could have concluded from the medical records that the delay [in providing medication] unnecessarily prolonged and exacerbated [the plaintiff's] pain and unnecessarily prolonged his high blood pressure").

Dr. Evans has identified enough deficiencies in the medical care at WCJ that a reasonable jury could conclude that it had a practice of ignoring inmates' medical problems and providing substandard care.

### b. Other ACH Practices

Plaintiff also identifies a number of other practices by ACH that it claims are further evidence of its widespread practice of inadequate care. (Pl.'s Summ. J. Resp. 9–10.) For example, Plaintiff asserts that Warkins, an LPN, improperly conducted assessments and evaluated patients. Defendants respond that Warkins did not directly evaluate patients, but worked under the direction of a Regional Nurse Manager. Defendants also contend that Williams regularly visited WCJ, and other ACH medical professionals were available by phone. There appears to a factual dispute over precisely how Warkins operated and how much supervision she had. This evidence may not be sufficient on its own, but could bolster Plaintiff's contention that ACH's policies resulted in constitutional violations.

### c.     Causation

Yet identifying a widespread practice of inadequate care is not enough; Plaintiff must also prove that the practice was the "moving force" behind Piercy's inadequate care. Defendants argue that Dr. Evans's testimony about the alleged widespread practice of inadequate care is not sufficient to establish causation. Defendants cite *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000), where a jail inmate had committed suicide. Although the plaintiff's expert testified to "numerous flaws in the [jail] policies for treating mentally ill inmates[,]" the court held that there was insufficient evidence that the jail personnel would have been aware of the risk if the policies were different—that is, there was no evidence that the policies were the moving force behind any deprivation of rights. *Id.* at 532.

Four years after *Novack*, however, the Seventh Circuit decided *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 919–20, 928 (7th Cir. 2004), affirming the district court's refusal to overturn the jury verdict for the plaintiff. There, as in *Novack*, an inmate had committed suicide. *Id.* at 928. Employees of the medical contractor defendant, CMS, knew that the plaintiff had a history of suicidal thoughts and violent behavior, and CMS's own policies thus required them to put the plaintiff on suicide watch and check him frequently. *Id.* The court recognized that CMS had these policies but noted evidence that CMS had a widespread practice of disregarding these same policies, which supported the jury's finding. *Id.* at 927–28. Had medical personnel followed these policies, they would have acted differently—putting the inmate on suicide watch and checking on him frequently—likely preventing his suicide. *Id.* The court distinguished *Novack* because the plaintiff was able to show that following the policies—taking those specific actions—would likely have made a difference. *Id.* at 928–29.

This case is more analogous to *Woodward* than to *Novack*. Warkins, Williams, and several correctional officers agreed that vomiting blood was a serious condition that required medical attention. (DSOF ¶ 56; Warkins Dep. 200:5–7; Williams Dep. 150:15–22.) A jury can

therefore infer that, if either of them were aware that Piercy was vomiting blood, they were also aware of the need for prompt action.  If ACH did have a widespread practice of minimizing the need for care or delaying care, that practice might have resulted in the individual Defendants' failure to (1) perform more thorough assessments, (2) seek evaluation from a specialist, or (3) report Piercy's condition and his need for prompt treatment to staff at Stateville NRC.  If they had taken any of these steps, a doctor may have found the source of Piercy's bleeding and been able to treat it.

For the same reason, Defendants' efforts to distinguish *Dixon v. County of Cook*, 819 F.3d 343 (7th Cir. 2016) also fall short.  There, the plaintiff, the representative of a deceased inmate, claimed that the defendant county jail's policies caused significant pain to the inmate, who received no care for a tumor that took his life only months after it was discovered.  *Id.* at 347.  The jail had a paper medical system, to which access was "haphazard," as well as an electronic records system, which was uncoordinated with the paper records system.  *Id.* at 348. The district court granted summary judgment for the county, but the Court of Appeals reversed, noting evidence that "pervasive systemic deficiencies" in the county jail's healthcare record-keeping could be the "moving force" behind the failure to treat the inmate.  *Id.* at 347–49. Defendants contend that in *Dixon*, unlike this case, the practice of poor record-keeping was "directly related" to the failure to provide care to the inmate (Summ. J. Reply 10), but the court does not see how that distinguishes *Dixon*.  If a jail has a widespread practice of providing inadequate care, it is a highly predictable consequence that, faced with a possibly serious medical condition, medical personnel would fail to inquire further, provide necessary medications, or seek the assistance of a specialist.

ACH notes that its policies direct medical personnel to take action when faced with bloody vomit.  This establishes that any failure to provide care was the result of failure to follow

policies,[19] ACH argues, not that ACH's policies or practices were deficient. (Defs.' Summ. J. Mem. 7.) But the mere fact that such policies existed does not preclude a finding that there was a widespread practice of ignoring those policies, as happened in *Woodward*. Plaintiffs can argue that the evidence supports a conclusion that the correctional officers, Warkins, or Williams were comfortable in failing to comply with policies because they did not fear repercussions.

Finally, Defendants argue that Plaintiff has not shown evidence that ACH was on notice of unconstitutional practices. Plaintiff, however, points out that a jury can infer that ACH "encouraged" or "condoned" an unconstitutional practice, if it is sufficiently widespread. *Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995). Plaintiff can survive summary judgment on the issue of notice from that argument alone.[20] There is thus enough evidence for a reasonable jury to conclude that ACH had a widespread practice of providing substandard medical care at WCJ, which caused Piercy's death. Summary judgment is denied on this issue.

### 2. Failure to Train Correctional Officers

Next, Plaintiff argues that ACH failed to adequately train the correctional officers "regarding the appropriate response to prisoner medical needs[.]" (Pl.'s Summ. J. Resp. 12.) In a failure-to-train claim, the plaintiff's injury must be a "highly predictable consequence" of inadequate training. *See Connick v. Thompson*, 563 U.S. 51, 64 (2011) (internal citation omitted). ACH argues that Plaintiff has waived this argument because the Fourth Amended Complaint alleges only that ACH failed to train medical staff, not correctional officers.

---

[19]     Defendants are not explicit whether they mean that the correctional officers failed to follow the policies, or that Warkins and Williams did. To the extent that ACH argues that it was the individual Defendants who failed to follow the policies, the court again notes a concern about the joint representation.

[20]     Plaintiff also argues that several prior lawsuits and a letter from the Department of Justice about another facility put ACH on notice of its inadequate medical care, which Defendants object to as irrelevant. (Pl.'s Summ. J. Resp. 11 n.5; Defs.' Resp. to PSOAF ¶ 47.) Because the court denies summary judgment without considering this evidence, it need not reach these arguments.

Defendants see this as an example of a plaintiff advancing an entirely new theory or cause of action at summary judgment. In the court's view, the change of focus merely reflects Plaintiff's having conducted discovery and having a better understanding of who first responded to medical complaints at WCJ. Second, ACH argues that it cannot be held liable for failing to train the correctional officers, because ACH is only responsible for training its own employees. But courts in this district have allowed a private corporation to be liable for failing to train correctional officers on matters relating to the private corporation's responsibilities. *See Awalt*, 74 F. Supp. 3d at 938 ("[T]here is sufficient evidence for a reasonable jury to find that . . . CHC/HPL's failure to train the correctional officers caused Awalt's death[.]"). Correctional officers would provide ACH employees with information about inmates' health, so ACH had a contractual interest in the officers' practice for obtaining and communicating that information. Indeed, there is evidence that correctional officers did give ACH employees information about inmates' medical conditions. (*See* Willhite Dep. 21:6–13, 21:19–25:15 (describing the log correctional officers make when distributing medications), 64:14–20; Simester Dep. 24:8–25:3, 129:6–8.)

There is enough evidence to create a dispute about whether correctional officers knew Piercy was vomiting blood, but failed to tell medical staff. Had they been adequately trained on how to use the protocols, Plaintiff contends, they would have known what to do about Piercy's bloody vomit—specifically, they would have known to contact the ACH medical providers. Assuming that ACH required jail officials to use these protocols (which the court must do on Defendants' summary judgment motion), Plaintiff claims that ACH did not train the officers on (1) when to consult the protocols that were intended to govern how the officers treated inmates when medical personnel were not present, and (2) how to reconcile allegedly conflicting protocols.

Defendants claim that Plaintiff's argument that officers were not adequately trained about whether to consult the protocols at all is a "red herring because the officers never consulted the protocols regarding Piercy." (Summ. J. Reply 11.) ACH seems to argue that if

the officers had consulted the protocols, then they would have called the provider (*id.* at 12), implying the fault lies, at most, with the officers, not ACH. But that is beside the point—when faced with an inmate who was vomiting blood, which the protocols clearly treat as a dire situation requiring immediate medical attention, officers did not consult them. The evidence of how much training officers received, moreover, is sufficiently vague that a reasonable jury could conclude that it was inadequate.

Defendants also argue that more training on when to consult the protocols would not have "affected the outcome" for Piercy. (*Id.* at 13–14.) Defendants again try to distinguish *Awalt*, where the court concluded that there was sufficient evidence for a jury to find that the failure to give the officers general training about when to consult medical professionals caused an inmate's death, after officers did not alert medical staff that he was having a seizure. 74 F. Supp. 3d at 938. Here, contrary to Defendants' argument, the evidence of causation is even clearer: Defendants themselves acknowledge that if the officers had consulted the protocols, they probably would have alerted medical staff to Piercy's condition.

Plaintiff's second argument, however, is a stretch. Plaintiff asserts that Protocol 06-05, which directs officers to "call [the] physician immediately" for a "large amount of blood" (Ex. 41 to PSOAF at ACH0316), is "conflicting and internally inconsistent" with Protocol 00-02, which directs officers to "automatically contact[]" a physician when an inmate is vomiting blood. (Ex. 5 to Ebersohl Dep., Ex. 9 to Mot. for Summ. J. at ACH0231.) These are not inconsistent instructions—Protocol 06-05 simply imparts a greater sense of urgency for a large amount of blood. More importantly, Protocol 00-02 explicitly directs the officer to "see Protocol 06-05." (*Id.*) There is no inconsistency: officers are directed to call a physician if an inmate is vomiting blood, and both protocols direct them to the same assessment questions in Protocol 06-05.

Although the second argument fails, a reasonable jury could conclude that the officers were inadequately trained about when to consult and use the protocols, which caused Piercy's death. Summary judgment is therefore denied on the failure to train claim.

### 3. Failure to Supervise Williams

Plaintiff claims that ACH did not adequately supervise Williams, resulting in Piercy's injury. As Plaintiff sees things, the need for additional supervision was obvious. In support, however, Plaintiff notes a single reprimand in the past and a generally low level of supervision—infrequent phone calls and chart reviews—which Plaintiff considers to be "*carte blanche* [for Williams] to act as he saw fit." (Pl.'s Summ. J. Resp. 15.) For several reasons, Plaintiff's "failure to supervise" theory is not sufficient on its own to establish *Monell* liability. First, the single prior reprimand is insufficient to put ACH on notice that Williams was providing constitutionally inadequate care. Moreover, physician assistants have substantial discretion, so even with additional supervision, it is likely that Williams would have been operating on his own much of the time. ACH's failure to maintain a copy of Williams's supervision agreement may have been sloppy, but there is no reason to believe the agreement was not in place.

Most importantly, the alleged poor supervision has no obvious relationship to the deliberate indifference alleged in this case. Williams acknowledged that bloody vomit is a serious symptom for which prompt treatment is required. The dispute in this case concerns not whether Williams was properly supervised, but whether he knew about Piercy's symptoms and failed to take appropriate action. Summary judgment is granted on the issue of ACH's failure to supervise Williams.

### C. Malpractice

Defendants claim that they are entitled to summary judgment on the medical malpractice claims because Plaintiff did not disclose an appropriate expert witness to support medical malpractice under Illinois law. For an Illinois malpractice claim, "expert medical testimony is required to establish the standard of care and the [defendant's] deviation from that standard." *Purtill v. Hess*, 111 Ill. 2d 229, 242, 489 N.E.2d 867, 872 (1986). Moreover, "the expert [must be] a licensed member of the school of medicine about which he proposes to express an

opinion[.]" *Id.* at 243, 489 N.E.2d at 872. Defendants contend that Plaintiff did not disclose a witness from the proper school of medical practice for either Warkins or Williams.

### 1. Malpractice Claim Against Warkins

Defendants argue that Nurse Speller's rebuttal report, which in which she opines on the nursing standard of care, should be stricken because it is not proper rebuttal. Defendants point out that the report does not mention the report of Nurse Rogers, Defendants' nursing expert, nor did Speller even review Rogers's report. (*See* Speller Rep. 1.) This argument has considerable merit, because Plaintiff offered no expert on the nursing standard of care in their initial expert disclosures, and Plaintiff's failure to provide such a report earlier is disappointing. The court nevertheless declines to strike the report, as explained here.

Federal Rule of Civil Procedure 37 requires exclusion of Speller's opinion unless the failure to disclose her report and opinion earlier is justified or harmless. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); FED. R. CIV. P. 37 ("If a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness . . . at a trial, unless the failure was substantially justified or is harmless."). To determine whether such a failure is harmless, courts are guided by four factors: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012), *as amended* (Feb. 2, 2012) (quoting *David*, 324 F.3d at 857).

Defendants claim to be surprised by the disclosure of Speller, and the fact that "Defendants have long been aware that Plaintiff believes Warkins fell below the relevant standard of care" (Pl.'s Expert Resp. 13), does not adequately address this concern. Nevertheless, the prejudice Defendants would suffer as a result of the late disclosure does not justify barring Speller as a witness. Plaintiff offered to schedule a deposition of Speller just a few days after disclosing her as an expert. (Ex. 9 to Pl.'s Expert Resp. [351-9].) Defendants

claim that this is not sufficient to cure the prejudice because "Defendants' experts will need time to review the reports and testimony" and "may need to supplement their reports[;]" Defendants may even need to disclose their own rebuttal experts. (Reply to Pl.'s Resp. to Defs.' Mot. to Strike and Bar Rebuttal Experts and Opinions [358] 6.) Plaintiff offered to schedule this deposition as early as December, however; trial was originally scheduled for April and now will begin at the end of June, leaving Defendants sufficient time to make these preparations. Nor does the court agree that consideration of Speller's report justifies an additional round of summary judgment briefing.

Third, because this disclosure happened months before trial, there is minimal likelihood of disruption of the trial. Finally, though the court is puzzled by Plaintiff's failure to disclose Speller earlier, the court is not prepared to conclude that counsel acted in bad faith.

The cases that Defendants cite are distinguishable. In *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 616 (7th Cir. 2002), the Court of Appeals affirmed the district court's barring a witness because "to have reopened discovery . . . would have extended the litigation[.]" As explained above, that is not the case here. In *Bowman*, 2012 WL 6596933, at *4, the court found that "reopening discovery to redepose Plaintiffs' experts would create significant costs and would delay the resolution of the motion for class certification." In *Stuhlmacher v. Home Depot USA, Inc.*, No. 2:10 CV 467, 2012 WL 5866297, at *4 (N.D. Ind. Nov. 19, 2012), the court barred testimony because it determined that conducting additional discovery would cause a delay. Finally, in *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 WL 1300763, at *2 (N.D. Ill. Feb. 22, 2005), the defendant included new arguments that plaintiff had not expected in its expert rebuttal reports. None of these scenarios are present here. Speller's report covers limited subject matter within this case and Defendants have had ample time to take her deposition, and will continue to have time for the next two months. The motion to strike Speller's report and bar her testimony is denied.

Defendants' argument for summary judgment on this claim is premised on the assumption that Nurse Speller's expert testimony as to the nursing standard of care would be barred. But Nurse Speller's opinion provides a genuine dispute of material fact as to whether Warkins met the nursing standard of care, when combined with the disputes around what Warkins knew with respect to Piercy's condition. Defendants' expert, Nurse Rogers, opines that Warkins met the nursing standard of care because she "collected" information and "collaborated" with Dan Williams. (Rogers Rep. 2–3.) Speller, on the other hand, opines that the nursing standard of care "required [Warkins] to ask Dale Piercy follow-up questions and conduct a follow-up assessment," and to maintain "accurate and complete medical records." (*See* Speller Rep. 2.) She concludes that Warkins's failure to (1) have Piercy evaluated by a doctor or physician assistant, (2) ask questions and conduct an assessment, and (3) fully document her encounter with Piercy violated this standard of care. (*Id.* at 1–2.) This presents a genuine dispute of material facts.

### 2. Malpractice Claim Against Williams

Defendants argue that summary judgment should be granted for Williams on the medical malpractice claim because Plaintiff has not disclosed any physician assistant expert who would testify to the physician assistant standard of care. Illinois law requires such testimony to support a malpractice claim. The purpose of requirement of testimony from a member of the same "school of medicine" is "to prevent a higher standard of care being imposed upon the defendant and to ensure that the testifying expert has expertise in dealing with the patient's medical problem and treatment and that the allegations of negligence are within the expert's knowledge and observation." *Wingo by Wingo v. Rockford Mem'l Hosp.*, 292 Ill. App. 3d 896, 906, 686 N.E.2d 722, 729 (2d Dist. 1997).

Plaintiff nevertheless suggests that a physician may testify to the standard of care for a physician assistant. Plaintiff points out that under Illinois law, physician assistants are supervised by physicians and "physicians are expressly charged with reviewing and supervising

the work of physician assistants, including recommendations regarding discipline[,]" which Plaintiff characterizes as "synonymous with the physician assistant's standard of care." (Pl.'s Summ. J. Resp. 20.) Illinois courts have expressly rejected this reasoning, however. In *Smith v. Pavlovich*, 394 Ill. App. 3d 458, 461, 914 N.E.2d 1258, 1262 (5th Dist. 2009), the proposed expert was an advanced practice nurse ("APN"), a license that "required [her] to work under a written collaborative agreement with a collaborating physician which, among other things, authorizes the categories of care, treatment, or procedures to be performed by the advanced practice nurse." The court found that a physician was not competent to testify for the standard of care for an APN, even though the physician effectively supervised the APN. *Id.* at 464, 914 N.E.2d at 1264–65. Similarly, here, the fact that a physician must supervise a physician assistant does not mean that the physician's opinion is admissible on the issue of Williams's compliance with the standard of care.

But Plaintiff also points out that Defendants themselves disclosed an expert witness who can testify to the physician assistant standard of care: Janet Furman. Furman testified that if the facts were as Plaintiff believes, Williams violated the standard of care:

> Q: If Dan Williams had been told that Dale Piercy was complaining of vomiting blood, the standard of care required him to do something more than prescribe omeprazole, correct?
> A: Correct.

(Dep. of Janet Furman, Ex. 18 to PSOAF [367-19] 99:24–100:4.) "A witness identified as a testimonial expert is available to either side[.]" *S.E.C. v. Koenig*, 557 F.3d 736, 744 (7th Cir. 2009); *see also Novey v. Kishwaukee Cmty. Health Servs. Ctr.*, 176 Ill. App. 3d 674, 679, 531 N.E.2d 427, 430 (2d. Dist. 1988) ("The testimony of the defendant medical practitioner or the defendants' own expert may be sufficient to establish the standard of care applicable to a defendant practitioner."). The fact that Defendants initially identified Furman as their expert does not prevent Plaintiff from relying on this testimony to prove his case. .

Defendants also argue that there is no genuine dispute that Williams met the standard of care, but Furman's testimony belies that claim, as well. It is disputed whether Williams knew that Piercy was vomiting blood. According to Furman, it is therefore also disputed whether Williams met the standard of care. Summary judgment is denied on the medical malpractice claim with respect to Williams. Because medical malpractice is a state law claim and subject to respondeat superior, summary judgment on this claim is also denied with respect to ACH.

### D.    Conspiracy

Defendants argue that the conspiracy claim should be barred by the intracorporate conspiracy doctrine, which states that "a conspiracy cannot exist solely between members of the same entity." *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999). Plaintiff responds that the doctrine "does not apply to a section 1983 claim." (Pl.'s Summ. J. Resp. 25.) The Seventh Circuit has held that the intracorporate conspiracy doctrine does claims of conspiracy by employees of the same corporation under § 1985, *Payton*, 184 F.3d at 632, which specifically contemplates conspiracy to deprive a person of civil rights. The Seventh Circuit has not explicitly addressed whether the doctrine also applies to § 1983; it has allowed conspiracy claims against employees of the same municipality, but in those cases, the parties did not raise the intracorporate conspiracy doctrine. *See Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012).

Recently, district courts have been disinclined to apply the doctrine in § 1983 cases. In *Reitz v. Creighton*, No. 15-CV-01854, 2015 WL 5081485, at *5 (N.D. Ill. Aug. 26, 2015), "Plaintiff allege[d] that Defendants conspired to file false and incomplete reports to cover up her illegal detention, the use of excessive force against her, the failure of officers to intervene, and to prevent disclosure of their misconduct." The court concluded that the intracorporate conspiracy doctrine did not bar the case against the defendants, officers of the same police department. *Id.* In *Cannon v. Burge*, No. 05 C 2192, 2006 WL 273544, at *15 (N.D. Ill. Feb. 2, 2006), *aff'd*, 752 F.3d 1079 (7th Cir. 2014), "Plaintiff allege[d] that the City Defendants conspired to: (1) falsely

arrest and imprison Plaintiff; (2) torture and physically abuse Plaintiff; (3) coercively interrogate Plaintiff; and (4) cause the wrongful charging, prosecution and conviction of Plaintiff." There too, the district court refused to apply the doctrine and allowed the plaintiff's conspiracy claim to proceed. *Id.* Both cases relied on certain language in *Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000), on which similar cases have relied:

> The intracorporate conspiracy doctrine was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory. The conduct plaintiff challenges here does not fit that mold. The decision to frame plaintiff for Cohen's murder, as plaintiff alleges it, is not the product of routine police department decision-making.

The reasoning of this line of cases is that "[t]he deprivation of civil rights is unlawful and the intra-corporate doctrine only applies when members of a corporation are jointly pursuing the corporation's 'lawful business.'" *Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810, 821 (N.D. Ill. 2006) (quoting *Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994)). The court is not certain that this distinguishes § 1983 cases from § 1985 cases. This court nevertheless adheres to the conclusions of its colleagues, as well as the implicit direction from the Seventh Circuit, and declines to enforce the doctrine.

Assuming that the intracorporate conspiracy doctrine does not bar the claim, the court concludes that there is a genuine dispute about whether Warkins and Williams reached an agreement, facilitated by ACH's policies. Defendants are correct that an agreement is a necessary element of a conspiracy claim, but the agreement need not be express. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir. 1979)). Indeed, evidence of the agreement may be circumstantial. Here, there is evidence that Warkins and Williams discussed Piercy's care and agreed on a course of action for his care, while potentially knowing that he was vomiting blood. This is sufficient to create a genuine dispute about whether Warkins and Williams reached an agreement concerning Piercy's treatment. Summary judgment on the conspiracy claim is denied.

E.    **Failure to Intervene**

A defendant can be liable for failure to intervene if he or she knew a constitutional violation was occurring and had a "realistic opportunity to intervene" to prevent it.  *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).  Defendants argue that summary judgment should be granted on the failure to intervene claim, but that argument is premised entirely on one assumption: that Williams was unaware that Piercy was vomiting blood.

Defendants argue that Williams could not intervene in a constitutional violation committed by Warkins, because he did not know that Piercy was vomiting blood.  Defendants also claim that Warkins could not intervene in a constitutional violation by Williams because Williams himself committed no constitutional violation.[21]  But, as the court noted above, whether Williams knew that Piercy was vomiting blood is disputed.  This dispute precludes summary judgment on the failure to intervene claim for both Warkins and Williams.

F.    **Intentional Infliction of Emotional Distress**

To recover for intentional infliction of emotional distress in Illinois, a plaintiff must prove "(1) that the conduct was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional distress."  *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 200 (2015) (citing *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 446, 828 N.E.2d 323, 333 (2d Dist. 2005)).  Defendants argue that Plaintiff's IIED claim fails on all three elements, but they focus on the first element.

First, it is disputed whether Warkins knew that Piercy was vomiting blood and whether she reported this to Williams.  It is therefore disputed whether Warkins and Williams chose not to (1) communicate this to Stateville NRC, (2) give him medication other than 20 mg of omeprazole, (3) examine him more thoroughly, or (4) seek more specialized care for him.

_____

[21]    The complaint itself alleges that the individual Defendants acted pursuant to ACH policies when failing to intervene (Fourth Am. Compl. ¶ 94), but all parties treat this as a claim against the individual Defendants alone.

Taking the facts in the light most favorable to Piercy, the question is whether such conduct is extreme and outrageous.

Defendants cite to *Bailey*, 779 F.3d at 692–93, where the plaintiff had been detained in a police interview room for just under 48 hours, and was handcuffed to a wall while detectives were not questioning him. The plaintiff was then charged and denied bail, but the prosecutor dismissed the charges less than a month later. *Id.* at 693. Plaintiff brought a claim of intentional infliction of emotional distress against the police officers, but the district court granted summary judgment, and the Seventh Circuit affirmed. *Id.* at 697. The court noted that the summary judgment record was "largely silent" on the conditions plaintiff suffered during his confinement: The court knew only that plaintiff was handcuffed to the wall, which the City claimed (1) was standard procedure when police were not present, (2) did not prevent the plaintiff from sleeping or moving around, and (3) did not interfere with plaintiff's ability to speak with police and to use the restroom whenever he wanted. *Id.*

The record here, by contrast, contains more information. If what Piercy claims is true, Warkins and Williams did not meet Piercy's basic needs, unlike the officers in *Bailey*. Piercy's vomiting blood reflects significantly more distress than being handcuffed in a room, so ignoring such distress is more extreme than the conduct in *Bailey*.

*Doe v. Calumet City*, 161 Ill. 2d 374, 641 N.E.2d 498 (1994), *overruled on other grounds by In re Chicago Flood Litig.*, 176 Ill. 2d 179, 196, 680 N.E.2d 265, 273 (1997), also does not defeat this claim. There, the court concluded that plaintiff stated a claim of extreme and outrageous conduct by a police officer who refused to break down an apartment door to rescue children alone with someone who had just tried to sexually assault their mother. *Id.* at 394–95, 641 N.E.2d at 507–08. The court found the allegations were insufficient as against other officers on the scene who merely followed the first officer's orders. *Id.* at 395, 641 N.E.2d at 508. *Doe* effectively recognizes a distinction between a defendant who actively refuses to help someone in severe distress, and one who simply goes along with another's determination about

what to do in the situation. Because it is unclear in this case what Warkins and Williams knew about Piercy's condition, the court cannot determine whether either of them actively decided not to help him.

Defendants also cite to *Estate of Gomes v. County of Lake*, 178 F. Supp. 3d 687, 694– 95, 701 (N.D. Ill. 2016), where a prisoner did not see a doctor until six days into her hunger strike and was not transported to a hospital until several days later. The court granted summary judgment on the prisoner's claim of intentional infliction of emotional distress, but not because the defendants' conduct was not extreme or outrageous, as Defendants here contend. (Summ. J. Reply 23.) Instead, the court noted that "[t]he standard for extreme and outrageous conduct is higher than what is required for deliberate indifference[,]" but addressed only the third element of IIED: that there was no evidence that the plaintiff actually suffered emotional distress. *Id.* at 702.

In *Awalt*, 74 F. Supp. 3d at 942, there was evidence that correctional officers knew that the plaintiff was having seizures, but took no action. Denying summary judgment, the district court found that "a reasonable juror could find that ignoring a patently severe medical condition such as a seizure is 'extreme and outrageous' conduct[.]" *Id.* This court is uncertain that vomiting blood is as severe a medical condition as a seizure, but the precise nature of Piercy's condition is sufficiently disputed that it cannot be resolved on summary judgment.

The severity of the medical condition in *Awalt* also implicated the second element; the court found that correctional officers knew "that there was a high probability that ignoring a seizure would cause severe emotional distress." *Id.* Finally, the court addressed the third element: "there is no question that their conduct caused Awalt severe emotional distress, since he in fact died." *Id.* In the case before the court, the jury could find that Piercy's several complaints to his cellmates and to Warkins about his bloody vomit evidenced emotional distress.

Defendants attempt to distinguish *Awalt* because there "all of the misconduct occurred at one facility," while Piercy continued to deteriorate after he left WCJ. (Summ. J. Reply 24.) Defendants add that Warkins did not have constant contact with Piercy, nor complete authority over him. But she and ACH did have authority over his medical care. And the fact that Piercy may not have been vomiting blood at the time he was transferred to Stateville NRC does not make ignoring a serious medical condition any less serious—*Awalt* teaches that ignoring seizures, for example, can be extreme and outrageous, even if the seizures were only periodic and not continuous.

Summary judgment is therefore denied on Plaintiff's IIED claims (as with the malpractice claim, this also applies to ACH because of respondeat superior). Defendants will be free to raise the issue again in connection with jury instructions.

### G. Punitive Damages

Defendants also move for summary judgment on the punitive damages request against Williams and ACH.[22] Plaintiff concedes that punitive damages are not available for his intentional infliction of emotional distress claim. On the other claims, however, Defendants acknowledge that punitive damages require an assessment of Defendants' motive, and that "evaluations of motive and intent are generally inappropriate on a motion for summary judgment[.]" (Defs.' Summ. J. Mem. 14 (quoting *Kyle v. Patterson*, 196 F.3d 695, 698 (7th Cir. 1999)).) The mental state for punitive damages, furthermore, is the same for § 1983 liability for deliberate indifference. *Woodward*, 368 F.3d at 930.

Because it is disputed whether Warkins and Williams are liable for deliberate indifference under § 1983, it is also disputed whether punitive damages are warranted. It is similarly disputed whether ACH had unconstitutional policies or practices in place. The Seventh Circuit has held that even a corporation can be liable for punitive damages when its policies

---

[22] Defendants' memorandum does not address the punitive damages claim against Warkins, so the court assumes that she does not seek summary judgment on this issue.

demonstrate "little regard for the inmates whose care it was charged with." *Id.* Summary judgment on the claim for punitive damages is denied.

## CONCLUSION

Defendants' motion to strike certain rebuttal expert reports and bar the corresponding expert testimony [341] is denied. Defendants' motion for summary judgment [345] is granted on the failure to supervise claim and punitive damages for the IIED claim, and otherwise denied. Defendants' statement of facts [346] and memorandum of law [347], erroneously docketed as motions, are terminated.

ENTER:

Dated: April 25, 2017

_____
REBECCA R. PALLMEYER
United States District Judge